RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 09a0297p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,

                 *Plaintiff-Appellee,*

         *v.*

REX A. DEITZ,

                *Defendant-Appellant.*

No. 05-3410

_____

Appeal from the United States District Court
for the Northern District of Ohio at Toledo.
No. 03-00739—David A. Katz, District Judge.

Argued: April 23, 2009

Decided and Filed: August 20, 2009

Before: COLE and CLAY, Circuit Judges; CLELAND, District Judge.[*]

_____

## COUNSEL

**ARGUED:** Dennis C. Belli, Columbus, Ohio, for Appellant. Joseph R. Wilson, ASSISTANT UNITED STATES ATTORNEY, Toledo, Ohio, for Appellee. **ON BRIEF:** Dennis C. Belli, Columbus, Ohio, for Appellant. Joseph R. Wilson, Ava M.R. Dustin, ASSISTANT UNITED STATES ATTORNEYS, Toledo, Ohio, for Appellee.

_____

## OPINION

_____

COLE, Circuit Judge. Defendant-Appellant Rex A. Deitz appeals his conviction by a jury for conspiracy to possess and distribute more than 50 grams but less than 500 grams of methamphetamine under 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B), and 846. He

_____

[*] The Honorable Robert H. Cleland, United States District Judge for the Eastern District of Michigan, sitting by designation.

also challenges his corresponding 144-month sentence. Deitz's conviction and sentence arise from his involvement with the Outlaw Motorcycle Club ("OMC" or "Outlaws"), an international motorcycle club with chapters nationwide and abroad. Following a large-scale investigation, Deitz and thirty-seven co-defendants were indicted for an alleged widespread conspiracy involving violations of the Racketeer Influenced Corrupt Practices Act ("RICO"), 18 U.S.C. § 1961, *et seq*., and various narcotics and firearms laws. Deitz asserts that his conviction is not supported by sufficient evidence, numerous other instances of trial error and prosecutorial misconduct violated his constitutional rights, the district court's decision to empanel an anonymous jury was an abuse of discretion, and his 144-month sentence is unreasonable. For the following reasons, we **AFFIRM** the judgment of conviction and sentence imposed by the district court.

## I. BACKGROUND

### A.      History of the OMC and Deitz's conviction

Since its founding outside of Chicago in 1935, the OMC has grown into an international motorcycle club with over 1700 dues-paying members belonging to 176 chapters throughout the United States and twelve foreign countries. *See* United States Department of Justice, *About Violent Gangs*, available at http://www.usdoj.gov/criminal/gangunit/about/omgangs.html (last visited July 20, 2009). The Outlaws are reputed to engage in a number of criminal activities, including arson, assault, explosives, extortion, fraud, homicide, intimidation, kidnapping, money laundering, prostitution, robbery, theft, and weapons violations. According to the United States Department of Justice gang reports, the Outlaws have a history of secrecy and violence, and are also well-known for retaliating against witnesses and informants. *Id*.

In December 1997, the Toledo, Ohio office of the Federal Bureau of Investigation ("FBI") and state law enforcement agencies began investigating the "Green region" of the Outlaws, which consists of OMC chapters in Dayton, Ohio; Fort Wayne, Indiana; Louisville, Kentucky; Indianapolis, Indiana; and Oklahoma City, Oklahoma. As a result of the FBI investigation, in April of 2003, a federal grand jury in the

Northern District of Ohio returned a forty-count indictment charging thirty-eight defendants with various offenses, including violations of RICO, drug trafficking, and firearms offenses. Deitz, a former Outlaw from 1987 through 1994, was charged with both the narcotics and firearms conspiracies.

The court tried the defendants charged with the RICO violations separately (*United States v. Wheeler*, No. 3:03-cr-07739 (N.D. Ohio)), and at the close of the first trial, the Government obtained a superseding indictment against thirteen defendants, which set forth two separate counts. Count 1, the narcotics conspiracy charge, and Count 2, the firearms conspiracy charge, were abbreviated versions of the drug and firearms conspiracy counts in the original indictment. Deitz was once again charged with both the narcotics conspiracy and the firearms conspiracy. Ten of the thirteen defendants charged under the superseding indictment pleaded guilty, but Deitz, Steven Warman, and Lloyd Heckman proceeded to trial together.

At trial, numerous government witnesses testified as to Deitz's involvement in the narcotics and firearms conspiracy, specifically describing incidents where Deitz sold methamphetamine, marijuana, and other drugs, and noting Deitz's participation in a drive-by shooting of a rival motorcycle gang's Indiana "clubhouse." The government also presented evidence of drugs seized from Deitz during 1991 and 1998 traffic stops occurring in Louisville, Kentucky. In 1991, acting on a tip from a confidential informant that Deitz would be transporting drugs from the Dayton clubhouse, officers stopped Deitz while he was driving back from Dayton to Kentucky. A warranted search of Deitz's car revealed approximately 195 grams of cocaine in a bag on the floor of the back seat. In 1998, police stopped Deitz at a Louisville, Kentucky roadblock. When Deitz failed to provide proof of insurance, the officers' search of his car turned up a briefcase containing marijuana, methamphetamine, cocaine, and $2000 in cash.

In defending the charges set forth in the indictment, Deitz argued that he withdrew from membership in the Outlaws in 1994, and that he has not attended club meetings or events since then. He also testified that he has never manufactured methamphetamine or sold drugs, and that because James "Frank" Wheeler, the

international OMC president, prohibited methamphetamine sales in the Green region, the government's theory that Deitz was a prominent methamphetamine dealer within the OMC narcotics conspiracy was unsupported.

On August 27, 2004, the jury returned a general verdict finding Deitz and Warman guilty of Count 1 (the narcotics conspiracy); Heckman was acquitted of Count 1, and Deitz was acquitted of Count 2 (the firearms conspiracy). The jury also returned a special verdict attributing more than 50 grams but less than 500 grams of methamphetamine to Deitz. The district court sentenced Deitz to 144 months' imprisonment and five years' supervised release. Deitz now appeals.

## II. ANALYSIS

**A.** **There is sufficient evidence to uphold Deitz's conviction for the narcotics conspiracy**

Deitz first challenges the sufficiency of the evidence to support his conviction for the narcotics conspiracy. The relevant question on appeal is "'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Martinez*, 430 F.3d 317, 330 (6th Cir. 2005) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "In making this determination, however, we may not reweigh the evidence, reevaluate the credibility of witnesses, or substitute our judgment for that of the jury." *Id*.

"[T]o sustain a conviction for conspiracy under 21 U.S.C. § 846, the government must have proved: (1) an agreement to violate drug laws, in this case 21 U.S.C. § 841; (2) knowledge and intent to join the conspiracy; and (3) participation in the conspiracy." *Martinez*, 430 F.3d at 330 (citing *United States v. Welch*, 97 F.3d 142, 148-49 (6th Cir. 1996)). "[P]roof of a formal agreement is not necessary; a tacit or material understanding among the parties will suffice." *Id*. (internal citations omitted). "The existence of a conspiracy 'may be inferred from circumstantial evidence that can reasonably be interpreted as participation in the common plan.'" *United States v. Salgado*, 250 F.3d 438, 447 (6th Cir. 2001) (quoting *United States v. Avery*, 128 F.3d

970, 971 (6th Cir. 1997)). Once a conspiracy is shown beyond a reasonable doubt, a defendant's connection to the conspiracy, "need only be slight, and the government is only required to prove that the defendant was a party to the general conspiratorial agreement." *Id.*

"A conspiracy requires: '(1) An object to be accomplished. (2) A plan or scheme embodying means to accomplish that object. (3) An agreement or understanding between two or more of the defendants whereby they become definitely committed to cooperate for the accomplishment of the object by the means embodied in the agreement, or by any effectual means.'" *United States v. Gibbs*, 182 F.3d 408, 420 (6th Cir. 1999) (quoting *United States v. Bostic*, 480 F.2d 965, 968 (6th Cir. 1973)).

> Drug distribution conspiracies are often "chain" conspiracies such that agreement can be inferred from the interdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell.

*United States v. Henley*, 360 F.3d 509, 513 (6th Cir. 2004) (quoting *United States v. Spearman*, 186 F.3d 743, 746 (6th Cir. 1999)). We also have noted that the government must "show the willful membership of [a] defendant in the conspiracy, but the government need not prove that the defendant committed an overt act in furtherance of the conspiracy." *United States v. Gardner*, 488 F.3d 700, 711 (6th Cir. 2007).

Deitz contends that his conviction for conspiracy is not supported by sufficient evidence because: (1) the government failed to prove that his alleged possession of cocaine in 1991 constituted an overt act in furtherance of the conspiracy; (2) the government failed to prove that his methamphetamine sales to Jerry Bloor, a confidential informant, and his marijuana transactions with Danny "Tubby" Garland, an Indianapolis chapter Outlaw, occurred within the scope of the conspiracy; (3) his 1998 drug possession and his 1999 offer to sell drugs to James Dilts, a confidential informant, involved single-participant acts that were not connected to the charged conspiracy; and (4) Bloor's testimony does not support the special verdict as to drug quantity. We consider each of Deitz's arguments in turn.

1.      *Deitz's possession of cocaine in 1991 was properly considered as part of the OMC narcotics conspiracy*

On March 20, 1991, FBI agents acting on a tip from a confidential informant followed Deitz while he drove from Louisville, Kentucky to Dayton, Ohio and back. At trial, Deitz testified that he had borrowed another Outlaw's car to give a friend a ride to Falmouth, Kentucky to visit his sick father, and that after dropping his friend off he continued on to Dayton to visit friends and speak with an individual about painting his motorcycle. Law enforcement stopped Deitz as he drove back into Kentucky, and a search of his car revealed approximately 195 grams of cocaine in a bag on the floor of the back seat. Deitz was charged in a Kentucky state court with possession of and trafficking in drugs. A jury acquitted Deitz of those charges.

Deitz claims that his possession of cocaine in 1991 is not an overt act in furtherance of the conspiracy, and, as such, it does not support his conviction. Deitz also contends that acts prior to the commencement of the conspiracy are irrelevant, and that "[t]wo cooperating witnesses (as well as the overt acts listed in the indictment) indicate that the conspiracy began in the Indianapolis chapter during the *1994-1995 time period*." (Deitz Br. 19-20) (emphasis added).

As a threshold matter, given that the government "need not prove that the defendant committed an overt act in furtherance of the conspiracy," Deitz's argument that his possession of cocaine in 1991 was not an overt act proving his participation in the underlying conspiracy is irrelevant. *Gardner*, 488 F.3d at 711; *see also United States v. Layne*, 192 F.3d 556, 567 (6th Cir. 1999). If the government can prove conduct, *in any form*, which is relevant to prove the conspiracy, that constitutes sufficient evidence under the statute. *See Gardner*, 488 F.3d at 711.

Regardless, Deitz's claim that the conspiracy did not begin until 1994 is belied by the record, and there is ample evidence for a reasonable jury to conclude that the 1991 cocaine seizure was part of Deitz's "willful membership" in the OMC narcotics conspiracy. For instance, at the time of the seizure, Deitz was a known Outlaw, and an informant told FBI agents that in late March, 1991, Deitz would be traveling to Dayton

to obtain drugs. Deitz did travel from Louisville to Dayton, and on his return, law enforcement stopped him and found the aforementioned cocaine in his possession, in an amount suggesting that the drugs were intended for distribution. *See United States v. Nelson*, 238 F. App'x 65, 72 (6th Cir. 2007) (finding that amount of narcotics found was evidence that defendant intended to distribute the drugs). A complex conspiracy such as the one at issue here cannot develop "out of thin air." Because the conspiracy alleged in the indictment involved the Outlaws' transport of drugs between various Green region clubhouses—the same conduct that led to Deitz's 1991 traffic stop—the stop was properly offered as evidence of Deitz's willful participation in the conspiracy, and Deitz's first argument fails.

2.     *Deitz's methamphetamine and marijuana sales occurred in the scope of the conspiracy*

Deitz next asserts that his alleged sales of methamphetamine and marijuana to Bloor and Garland did not occur within the scope of the conspiracy. He argues that if such sales had occurred, they would not have furthered the underlying OMC narcotics conspiracy because Wheeler and other Outlaws had specifically excluded him from participating in that conspiracy.

At trial, government informant Catherine Solgot, Garland's ex-girlfriend, testified that she lived with Garland in Indianapolis for approximately three years, beginning in October 1997. Solgot testified that during that period, she witnessed Garland conduct numerous drug transactions (mostly involving marijuana, cocaine, and pills) with other Outlaws, including Deitz, and that she sold drugs for Garland. Solgot testified that beginning in 2000, Garland and Deitz regularly conducted transactions of approximately five-to-ten pound amounts of marijuana. Solgot explained that when Garland sold marijuana to Deitz, she would travel with Garland to Columbus, Ohio, where he would give Deitz drugs provided by Wheeler or other Outlaws, though she was unsure if Deitz paid for the drugs upon receipt or later. On other occasions, Deitz would deliver five-to-ten-pound amounts of marijuana to Garland's home in Indianapolis; and

at times when Garland was not home, Solgot would pay Deitz for the drugs and store them in a back room.

James Dilts, an Outlaw in the Dayton chapter and an FBI informant from 1998 through 2000, testified that Deitz was known as a source of methamphetamine in the Green region. At trial, Dilts explained that when he traveled to the Louisville clubhouse in 1999 and asked the chapter president, Jerry Kinser, where he could purchase methamphetamine, Kinser introduced him to Deitz and identified him as a methamphetamine source. Dilts testified that when he met Deitz at a local bar, Deitz told him that he had a connection to obtain the ingredients used to make methamphetamine and that he would sell Dilts methamphetamine at a party later that week. Dilts also testified that Kinser warned him that although Deitz was an Outlaw, Dilts should be careful because he had heard Deitz might be facing indictment for selling cocaine to an undercover FBI or DEA agent. Bloor likewise testified that he purchased methamphetamine from Deitz multiple times, both for personal use and for resale to other Outlaws.

Deitz relies heavily on our decision in *Gibbs* in arguing that his sales of drugs did not occur within the scope of the narcotics conspiracy. 182 F.3d at 408. In *Gibbs*, a loosely associated group of drug dealers in Columbus, Ohio were charged with a conspiracy to control the distribution of cocaine in a local area by excluding non-local drug dealers. *Id*. There, we vacated several of the defendants' convictions, explaining that although the government successfully proved that the defendants sold drugs in the area during the relevant time period, there was no evidence that they had agreed to participate in the charged conspiracy to "exclude outsiders." *Id*. at 423.

The allegations against Deitz are distinguishable from those at issue in *Gibbs* because Deitz has not identified any aspects of the charged conspiracy for which the jury could not have inferred his involvement. The indictment and superseding indictment in this case alleged a conspiracy to distribute and possess with intent to distribute a wide range of drugs "through [defendants'] membership in and participation in the [OMC]." (Joint Appendix ("JA") 305, 369.) The "Means and Methods" and "Manner and Means"

sections of both indictments detail the individual leadership roles of certain defendants and set forth the names of the individuals who, as members and associates of the OMC, allegedly distributed these controlled substances. Moreover, the evidence demonstrates that the indicted individuals, including Deitz, used their affiliation with the OMC to distribute drugs. For instance, Outlaw status was difficult to attain and maintain, the club had regular meetings and required members to pay significant dues, members occasionally attended meetings regarding international issues, and members' mutual trust was enforced by a club policy of violence against "snitches." In contrast to *Gibbs*, the evidence presented against Deitz demonstrates that Deitz "had knowledge of the agreement" that the OMC intended to use its organizational structure and contacts to facilitate the sale of drugs, and that he had "acquiesced in that agreement." 182 F.3d at 422. Therefore, a reasonable jury could have found that Deitz's methamphetamine and marijuana sales occurred in furtherance of the conspiracy.

### 3. *Deitz's drug sales were not merely buyer-seller transactions*

Deitz also argues that the testimony of Bloor, Dilts, and Solgot regarding his various drug transactions during the 1990s described isolated buyer-seller transactions that did not further the underlying conspiracy. The record tells a different story.

"Generally, a buyer-seller relationship alone is insufficient to tie a buyer to a conspiracy because 'mere sales do not prove the existence of the agreement that must exist for there to be a conspiracy.'" *United States v. Cole*, 59 F. App'x 696, 699 (6th Cir. 2003). "Nonetheless, [we] have often upheld conspiracy convictions where there was additional evidence, beyond the mere purchase or sale, from which the knowledge of the conspiracy could be inferred." *Id.*; *see also United States v. Nesbitt*, 90 F.3d 164, 167 (6th Cir. 1996) (concluding that evidence of advanced planning and multiple transactions involving large quantities of drugs may show that the defendant was involved in the conspiracy and was not merely engaged in a buyer-seller relationship); *United States v. Anderson*, 89 F.3d 1306, 1310 (6th Cir. 1996) (holding that repeat purchases, purchases of large quantities, or other enduring arrangements, are sufficient to support a conspiracy conviction). We have cited with approval the Seventh Circuit's construct, which

considers a list of factors to determine whether a drug sale is part of a larger drug conspiracy. *Cole*, 59 F. App'x at 700 (citing *United States v. Rivera*, 273 F.3d 751, 755 (7th Cir. 2001)). These factors include: (1) the length of the relationship; (2) the established method of payment; (3) the extent to which transactions are standardized; and (4) the level of mutual trust between the buyer and the seller. *Id.* (citing *Rivera*, 273 F.3d at 755).

A reasonable jury could infer from the testimony of Bloor and Solgot that Deitz's drug transactions during the 1990s were part of the OMC narcotics conspiracy. The evidence shows that Deitz routinely engaged in narcotics distribution activities with fellow Outlaws—both buying from, and selling to, them. For instance, Bloor testified that he purchased methamphetamine from Deitz many times, which he would use himself, sell, or give to other Outlaws to enable them to "stay awake" while transporting drugs. Deitz contends that Bloor was not credible because of his history of drug use and mental instability, however, "on appeal, there is no place . . . for arguments regarding a government witness's lack of credibility . . . ." *United States v. Talley*, 164 F.3d 989, 997 (6th Cir. 1999) (internal citations omitted). Solgot's testimony provides additional support for the jury's finding that Deitz was involved in the underlying conspiracy. Solgot testified that Garland engaged in approximately ten marijuana sales with Deitz beginning in 2000, and that the marijuana Garland sold to Deitz originated from Wheeler and other high-level Outlaws. Also, Solgot's testimony that she occasionally accepted marijuana from Deitz on Garland's behalf demonstrates that Deitz trusted both Solgot and Garland through their established dealings with one another. Taken together, these frequent transactions between Deitz, an Outlaw until 1994, and various other Outlaws, were sufficient to allow a reasonable jury to conclude that Deitz participated in the OMC narcotics conspiracy.

Finally, Deitz asserts that his alleged transactions with Dilts were not part of the conspiracy because Dilts, an informant from 1998 through 2000, could not "conspire" with Deitz. While it is true that Dilts's status as a government agent prevents the government from proving the existence of a conspiracy solely between Dilts and Deitz,

the transactions and conversations between the two men can properly be considered as evidence of a conspiracy existing among Deitz and *other* Outlaws. *See, e.g.*, *United States v. Keeler*, 285 F. App'x 262, 266 n.1 (6th Cir. 2008) (explaining that defendant's drug-related conversations with government agent could not be used to prove the existence of a conspiracy between the defendant and the agent, but could be considered as evidence of a conspiracy between defendant and others); *see also United States v. Hayden*, 68 F. App'x 530, 532 (6th Cir. 2003) ("The rule that government agents do not count as coconspirators, however, is limited to situations in which the conspiracy involves *only* one defendant and a government informer.").

Regardless, Deitz's argument assumes that proof of drug sales is necessary to establish an agreement to distribute drugs when all that is required is evidence of "a tacit or material understanding among the parties." *Henley*, 360 F.3d at 513; *see also Hayden*, 68 F. App'x at 532 (noting that "[i]t is sufficient in a 'drug-chain conspiracy' to show that each member of the conspiracy realized that he was participating in a joint venture"). This threshold is certainly met here. Dilts's testimony establishes Deitz's continuing membership in and association with the OMC. Dilts testified that in July 1999, when he asked about purchasing methamphetamine, Kinser introduced him to Deitz, who sought to arrange a deal. Dilts also testified that Kinser advised him not to buy drugs from Deitz because, despite the fact that Deitz was in good standing with the Outlaws and was a known methamphetamine source, he would likely be indicted for selling drugs to an undercover agent. From this testimony, a jury could reasonably infer that Deitz regularly engaged in methamphetamine sales to Outlaws and Kinser had identified Dilts as a trusted club member, supporting a conclusion that Deitz's drug transactions were part of the OMC narcotics conspiracy.

### 4. *The jury's special verdict regarding drug quantity was proper*

The jury's special verdict attributed 50 or more grams of a mixture or substance containing methamphetamine to Deitz. The verdict was based on a combination of the amount 9.5 grams of methamphetamine seized from Deitz following the 1998 Kentucky traffic stop, Dilts's testimony that Deitz offered to sell him 14.17 grams of

methamphetamine, and Bloor's estimate that he had bought at least 56.58 grams of methamphetamine from Deitz. Deitz argues that there is insufficient evidence to support the jury's special verdict because: (1) the alleged methamphetamine transactions were outside the scope of the conspiracy; (2) Bloor's testimony was inadequate to prove circumstantially that the substance contained methamphetamine; and (3) Bloor's estimate of drug quantity was unreliable. We reject each of Deitz's arguments.

First, as we have explained, a reasonable jury could infer from Bloor's and Solgot's testimony that Deitz's frequent drug transactions during the 1990s, and the 1998 Kentucky traffic stop where Deitz was found to possess marijuana (114 grams), methamphetamine (9.5 grams), and cocaine (6.4 grams), were part of the underlying conspiracy. Thus, the jury was entitled to consider the evidence of Deitz's methamphetamine transactions with Bloor. Moreover, we find meritless Deitz's arguments that Bloor's testimony was inadequate and unreliable because Bloor "did not describe the appearance of the substance and did not indicate the name by which Deitz referred to it," or state the price he allegedly paid. The case on which Deitz relies, *United States v. Robison*, 904 F.2d 365, 371-72 (6th Cir. 1990), is easily distinguishable because it involved an improper drug-quantity calculation by a district court during sentencing rather than a special verdict by the jury. Further, Deitz's argument asks us to substitute our own evaluation for the jury's conclusion about the weight of the evidence and witness credibility, which we may not do. *See Talley*, 164 F.3d at 996.

### 5. *Conclusion*

For the foregoing reasons, we cannot say that, the jury acted irrationally in finding that Deitz committed all the elements of the OMC narcotics conspiracy. Thus, the evidence presented at trial was sufficient to sustain Deitz's conviction.

**B.     The admission of testimony by FBI Agent David Potts did not violate Deitz's rights under the Confrontation Clause**

Deitz also argues that the admission of certain testimony by FBI agent David Potts about why authorities followed Deitz on his drive to and from Dayton violated his rights under the Confrontation Clause.  Deitz argues that Agent Potts's testimony that the FBI was surveilling Deitz, because it had received tips from informants that Outlaws from the Louisville chapter regularly obtained cocaine from members of the Dayton chapter and transported it back to Kentucky, was inadmissible because it was based on hearsay relayed to Agent Potts by a confidential informant.

The Confrontation Clause of the Sixth Amendment bars the "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004).  Generally, we review alleged violations of the Confrontation Clause de novo.  *United States v. Robinson*, 389 F.3d 582, 592 (6th Cir. 2004).  If, however, a defendant fails to object to an error at trial, plain-error review applies.  *United States v. Powers*, 500 F.3d 500, 505 (6th Cir. 2007). Although defense counsel objected to certain testimony by Agent Potts at trial, the objection  pertained *only* to Agent Potts's testimony regarding what he heard over the radio while he was on break, and did not relate to his earlier testimony about why authorities were following and surveilling Deitz on his trip to Dayton. (*See* JA 515 (defense counsel's objection to Agent Potts's testimony).)  Therefore, we review Deitz's Confrontation Clause argument for plain error.  *See United States v. Cromer*, 389 F.3d 662, 672 (6th Cir. 2004).  In conducting plain-error review, we reverse only when the following four prongs are met:

> (1) there must be an error or defect that the appellant has not affirmatively waived; (2) it must be clear or obvious; (3) it must have affected the appellant's substantial rights, *i.e.*, affected the outcome of the district court proceedings; and (4) if the three other prongs are satisfied, the court of appeals has the *discretion* to remedy the error if it seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.

*See Puckett v. United States*, 129 S. Ct. 1423, 1425 (2009) (internal citations omitted).

To trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay—that is, a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *Gibbs*, 506 F.3d at 486 (citing Fed. R. Evid. 801(c)). We have held that statements by a confidential informant are "testimonial" and thus, subject to the Confrontation Clause. *Cromer*, 389 F.3d at 675-76. However, we have also clarified that "[t]he Confrontation Clause 'does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.'" *Id*. at 676 (quoting *Crawford*, 541 U.S. at 59 n.9).

Therefore, although the fact that the declarant was a confidential informant makes his statements testimonial, we must also consider whether the statements were offered to establish the truth of the matter asserted. In *Cromer*, the evidence at issue was a police officer's testimony that a confidential informant, not called as a witness at trial, indicated that drug sales had been made from a particular residence and that an individual resembling the defendant had been involved in the drug transactions. *See* 389 F.3d at 673-74. There, we held the officer's testimony admissible to the extent that it merely "alluded to" the confidential informant's statements for the background purposes of "explaining how certain events came to pass or why the officers took the actions they did" in searching the residence identified by the informant. 389 F.3d at 676. On the other hand, we found that testimony by the informant that "could only have been [offered] to help establish" an element of the prosecution's case was inadmissible. *Id*.; *see also Gibbs*, 506 F.3d at 486-87 (finding no *Crawford* violation because the challenged testimony "[d]id not bear on" any element of the charges against defendant, and "a review of the record reveals that [the purportedly hearsay aspect of the testimony] was a miniscule part of [the witness's] overall testimony").

The admission of Agent Potts's testimony explaining why authorities were following Deitz on his drive to and from Dayton was not plain error as it provided mere background information, not facts going to the "very heart of the prosecutor's case." *See Cromer*, 389 F.3d at 667-78. In fact, it was not the informant's statements that were

material, but rather, Potts's own statement about what he found when he stopped Deitz, which was not hearsay. Moreover, had defense counsel objected to the testimony at trial, the court could have easily restricted its scope. *United States v. Hunt*, 278 F. App'x 491, 495 (6th Cir. 2008) (noting that court limited the scope of government witnesses's testimony to ensure that the tip was mentioned strictly for background information). Therefore, Deitz's Confrontation Clause claim is without merit.

**C.      The district court's decision to empanel an anonymous jury did not violate Deitz's Sixth Amendment right to a fair trial**

The district court granted the government's motion to empanel an anonymous jury in Deitz's trial, adopting the reasoning that led it to grant the government's first request in the trial of the RICO defendants, where it explained:

> The indictment in this case alleges numerous acts of violence and obstruction of justice. The government's memorandum sets forth a litany of activities of the "Green" region of the OMC which amply justify the conclusion that an anonymous jury is necessary . . . . Of extreme importance in the Court's consideration of the issues is the statement made at the pretrial conference held December 31, 2003. Assistant U.S. Attorney Joseph Wilson, speaking at the beginning of the pretrial when all counsel for defendants were in attendance (which portion of the conference was held *in camera*), reported as follows:
>
> > In December 2003, the FBI received information from a confidential informant that certain defendants in this case were contracting to arrange the murders of witnesses, court officers and prosecutors. This information was corroborated by subsequent investigation by the FBI. The investigation into these threats is ongoing.
>
> That statement demonstrates the "propensity" of the defendants, or at least some of them and/or the OMC itself, to go to extremes in intimidation, which intimidation cannot be permitted to be directed at jurors. The fear of such actions, based upon reliable information provided to the FBI and confirmed by investigation, would in itself justify the Court granting the government's motion.

(*United States v. Wheeler* (Doc. No. 783), JA 1209-12.) The district court also noted that other courts had previously recognized the OMC's history of violence and jury

tampering. (JA 1210 (citing *United States v. Bowman*, 302 F.3d 1228 (11th Cir. 2002) (upholding empaneling of anonymous jury in trial of Harry Bowman, the former international president of the OMC)).)

A district court may empanel an anonymous jury in any case in which the interests of justice so require, 28 U.S.C. § 1863(b)(7), and the decision "is within the sound discretion of the trial court." *United States v. Lawson*, 535 F.3d 434, 439 (6th Cir. 2008) (affirming conviction and sentence in appeal by RICO defendant in *United States v. Wheeler*) (quoting *Talley*, 164 F.3d at 1001). In *Talley*, we upheld the district court's decision to empanel an anonymous jury where evidence showed that the defendant had previously manipulated the justice system and threatened to kill a witness. 164 F.3d at 1001-02. We explained that:

> The anonymity of the jury should be preserved in cases: (1) with very dangerous persons who were participants in large scale organized crime, and who participated in mob-style killings and had previously attempted to interfere with the judicial process; (2) where defendants have had a history of attempted jury tampering and serious criminal records; or (3) where there have been allegations of dangerous and unscrupulous conduct by the defendant, coupled with extensive pretrial publicity . . . In deciding to empanel an anonymous jury, the court must ensure that the defendant retains his or her right to an unbiased jury by conducting "a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself," and by providing the jury a neutral and non-prejudicial reason for requiring that it be anonymous, so that jurors will refrain from inferring that anonymity was necessary due to the character of the defendant.

*Talley*, 164 F.3d at 1001-02.

Deitz argues that the district court's decision to empanel an anonymous jury over defendants' objections was an abuse of discretion that warrants the reversal of his conviction. We disagree. The record supports the district court's conclusion that anonymity was appropriate as a safety precaution and to avoid interference with the jury's ability to function. First, the record provides extensive evidence that Deitz, Warman, and Heckman were members of, or closely associated with, the OMC, an organization with a long history of crime and violence. *See Talley*, 164 F.3d at 1001-02;

*see also United States v. Doe*, 63 F.3d 121, 130 (2d Cir. 1995) ("The problem of retaliatory acts against those producing adverse testimony is especially acute in the context of criminal organizations . . . ."). Second, the government presented testimony from a prison informant who overheard Warman discussing plans to harm the prosecutors and the presiding judge in his case. *Talley*, 164 F.3d at 1001-02. Third, the defendants faced lengthy sentences upon conviction, increasing the likelihood that they would resort to extreme measures to influence the outcome of their trials. *See id.*; *see also United States v. Ochoa-Vasquez*, 428 F.3d 1015, 1035 (11th Cir. 2005) (considering fact that defendant faced a "lengthy sentence if convicted" in analyzing the district court's decision to empanel an anonymous jury). Therefore, the judge's decision to empanel an anonymous jury was not an abuse of discretion.

Although not raised or briefed by the parties, we examine briefly the district court's explanation to the jury of its reasons for anonymity. When empaneling an anonymous jury, the district court must provide the jurors with a "neutral" and "non-prejudicial" explanation. *Talley*, 164 F.3d at 1002. Both this Court and several other circuits have held that the need to protect the jury from unwanted publicity is an appropriate explanation. *See id.* (finding proper the court's explanation to jurors that they would be anonymous to prevent the occurrence of unwanted media contact); *see also United States v. Marrero-Ortiz*, 160 F.3d 768, 776 (1st Cir. 1998) (same); *United States v. Thomas*, 757 F.2d 1359, 1365 (2d Cir. 1985) (same); *compare United States v. Scarfo*, 850 F.2d 1015, 1025-26 (3d Cir. 1988) (finding appropriate judge's statement to jurors that they would remain anonymous to ensure that they would not be influenced either by fear of retaliation by defendants or by media attention).

Here, the district judge explained to the jury: "Because of the unusually large number of prospective jurors in this multi[-]defendant criminal trial, and to ensure a fair trial, the Court has directed that the jurors will be anonymous." (JA 441.) While it is always a preferred practice for a district judge to be as clear and accurate as possible on the reasons for using an anonymous jury, and this statement differs from the protection-from-media-attention explanation typically given, in an appeal by one of the OMC-

defendants from the first trial, we found an identical explanation to be sufficiently neutral and non-prejudicial under *Talley*. *See, e.g., Lawson*, 535 F.3d at 440 ("The court provided the jurors with a neutral, non-prejudicial reason for requiring their anonymity by telling them that anonymity was required by the unusually large number of prospective jurors."). We reach the same conclusion here, and find no error. Therefore, neither the court's empaneling of an anonymous jury nor its explanation to the jury was an abuse of discretion.

**D.   Deitz's other alleged trial errors do not warrant the reversal of his convictions**

   *1.   Admission of witness testimony and physical evidence pertaining to the 1991 and 1998 drug seizures was not improper*

   *a.   The admission of the evidence regarding the 1991 drug seizure did not violate the Double Jeopardy clause of the Fifth Amendment*

The district court admitted the narcotics seized during the 1991 stop, explaining:

> The issue of guilt or innocence of that act for which Mr. Deitz was acquitted in Jefferson County, Kentucky is not the issue here. It is whether the act was part of a conspiracy and is evidence of a conspiracy. Totally different issue. I will therefore deny the motion in limine with you preserving your objections.

(JA 480-81.) Deitz argues that the district court's ruling violated his rights under the Double Jeopardy Clause because he was previously charged with and acquitted of drug possession and trafficking in Kentucky state court following the 1991 seizure. We disagree.

Usually, prosecution in both state court and federal court for offenses that would otherwise constitute the same "offense" under the Fifth Amendment if tried successively in the same forum, is constitutional under the dual sovereignty doctrine. *See Heath v. Alabama*, 474 U.S. 82, 88-89 (1985). The doctrine provides that "the double jeopardy clause does not apply to suits by separate sovereigns, even if both are criminal suits for the same offense." *United States v. Louisville Edible Oil Prods., Inc.*, 926 F.2d 584, 587 (6th Cir.1991) (internal citation omitted). However, the doctrine is subject to certain

limitations, one being the "sham-prosecution" exception, which bars manipulation of the state system by federal officials to achieve the equivalent of a second federal prosecution. *See Bartkus v. Illinois*, 359 U.S. 121, 123-24 (1959) (dictum); *see also United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir. 1983) (relying on *Bartkus* to hold that a second prosecution by another sovereign is barred when it is a "'[s]ham and a cover' for the first").

Deitz argues that his case falls under the sham-prosecution exception because federal authorities "orchestrated" his arrest by the Kentucky police. However, the complex conspiracy at issue in Count 1 of the superseding indictment encompasses substantially different elements from those at issue in the violation of Kentucky statutes prohibiting possession of and trafficking in controlled substances. *See United States v. Clark*, 254 F. App'x 528, 532-33 (6th Cir. 2007) (rejecting plaintiff's sham-prosecution argument where the state prosecution for simple drug possession was different in nature from the federal drug-conspiracy charge). Also, nothing in the record suggests that Kentucky authorities "did not make their own determinations" regarding whether to prosecute Deitz following the 1991 seizure. *Id.* (rejecting defendant's sham-prosecution argument where "'the separate sovereigns have made independent decisions to prosecute'") (quoting *United States v. Angleton*, 314 F.3d 767, 774 (5th Cir. 2002)). Therefore, we reject Deitz's Double Jeopardy argument.

> b.       *Deitz has not established plain error as to his claim that the 1998 Kentucky drug seizure violated his Fourth Amendment rights*

Deitz argues that the admission of evidence relating to the 1998 seizure of marijuana, cocaine, and methamphetamine from the briefcase found in his vehicle during a routine traffic stop, violated his Fourth Amendment rights because he never consented to the officers' search of the briefcase. At trial, Louisville police officer Brian Thompson testified that the September 9, 1998 roadblock at which he stopped Deitz had been erected under the department's drug interdiction policies. Thompson and another officer arrested Deitz when he failed to provide proof of insurance for his vehicle, and, with Deitz's consent, they searched his vehicle, and Officer Thompson found a briefcase

that contained drugs and $2000 in cash.  Although Deitz consented to a search of the car, he claims that he never consented to a search of his briefcase and that the officers' search violated the Fourth Amendment.

Deitz failed to raise this argument at trial.  We have previously held that "[w]hen faced with a defendant's complete failure to file a pretrial suppression motion, . . . 'we are categorically without jurisdiction to hear appeals of suppression issues raised for the first time on appeal.'" *United States v. Lopez-Medina*, 461 F.3d 724 (6th Cir. 2006) (internal citation omitted).  However, we have also applied Rule 52(b)'s plain-error review to new suppression arguments raised for the first time on appeal after a defendant's original suppression arguments proved unsuccessful at the trial court level. *Id.* (citing *United States v. Critton*, 43 F.3d 1089, 1093 (6th Cir. 1995) (noting that "[w]e consider a claim first raised on appeal only to correct errors that 'are obvious, or if they otherwise seriously affect the fairness, integrity, or public reputation of judicial proceedings.'") (quoting *United States v. Atkinson*, 297 U.S. 157, 160 (1936)). Nonetheless, the jurisdictional issue is of no moment because Deitz's claim fails even under plain-error review.  *Puckett*, 129 S. Ct. at 1425 (outlining the elements of the plain-error test).

The Fourth Amendment protects a person's right to his personal property without interference from the police absent consent or reasonable suspicion or probable cause that a crime has been, will be, or is being committed.  *See United States v. Buchanon*, 72 F.3d 1217, 1228 (6th Cir. 1995).  Deitz asserts that Officer Thompson's admission that Deitz did not consent to the search of his briefcase and the "questionable assertion that a police officer in Kentucky has discretion to make a full-blown arrest for lack of proof of insurance," show that the arrest was merely an excuse to justify the search of the briefcase. (Deitz Br. 38.)  Deitz's claim fails.

In 1998, an unwarranted search incident to a custodial arrest constituted an exception to the warrant requirement of the Fourth Amendment where the search was necessary to assure an officer's safety or preserve evidence.  *See United States v. Robinson*, 414 U.S. 218, 235 (1973).  Thus, at the time of the incident in question, police

could lawfully search an arrestee and the area "within his immediate control"—meaning the area from which he might gain possession of a weapon or destructible evidence. *See Chimel v. California*, 395 U.S. 752, 763 (1969). However, on April 21, 2009, the Supreme Court clarified its previous rulings on this issue. *See Arizona v. Gant*, 129 S. Ct. 1710, 1713 (2009). In *Gant*, the Court held that authorities may not conduct an unwarranted search of the passenger compartment of a vehicle unless "it is reasonable to believe that the arrestee might access the vehicle at the time of the search or that the vehicle contains evidence of the offense of arrest." *Id*. at 1713. Under *Gant*, the officers' warrantless search of Deitz's briefcase violated his Fourth Amendment rights because the officers had no reason to suspect that the briefcase contained evidence related to the offense of arrest—Deitz's failure to show proof of insurance. Nevertheless, at the time the officers stopped Deitz in 1998, they could lawfully search the articles within Deitz's control that might contain destructible evidence. *See Chimel*, 395 U.S. at 763; *see also Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) (holding that a custodial arrest for minor traffic infraction did not violate the Fourth Amendment). Therefore, no plain error occurred, and Deitz's Fourth Amendment argument is without merit.

2.     *The admission of contested evidence did not violate Rule 403*

Next, Deitz asserts that the district court improperly admitted irrelevant and highly prejudicial evidence in violation of Rule 403 of the Federal Rules of Evidence ("Rule 403").[1] Specifically, Deitz objects to the admission of the following: (1) testimony by Bloor, Tracey Tipton, Ronald Talmadge, and Gary Watkins that their fear of the OMC caused them to enter the Witness Protection Program; (2) testimony by Dilts that Outlaw David Jack Hannum told him that he had witnessed OMC members kill a suspected informant by slashing his throat; (3) photographs of t-shirts reading "snitches are a dying breed" seized from Deitz's home by law enforcement during their

---

[1]Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.

execution of search warrants; (4) the drugs seized during Deitz's 1991 and 1998 arrests; and (5) the Dayton chapter t-shirt Deitz wore at the time of his 1998 arrest.

We review a district court's evidentiary rulings for abuse of discretion. *See United States v. Wagner*, 382 F.3d 598, 616 (6th Cir. 2004). However, where a defendant fails to object at trial or "does not state the specific ground for his evidentiary objection, and that ground is not apparent from the context, we review a newly raised objection under the plain-error standard. *United States v. Seymour*, 468 F.3d 378, 384 (6th Cir. 2006) (quotation omitted); *see Puckett*, 129 S. Ct. at 1425 (outlining the elements of the plain-error test).

When reviewing for abuse of discretion, we view "the evidence in the light most favorable to its proponent, giving the evidence its maximum reasonable probative force and its minimum reasonable prejudicial value." *United States v. Jackson*, 473 F.3d 660, 668 (6th Cir. 2007) (quoting *United States v. Moore*, 917 F.2d 215, 233 (6th Cir. 2009)). Moreover, "the prejudice to be weighed is the *unfair* prejudice caused by admission of the evidence. Evidence that is prejudicial only in the sense that it paints the defendant in a bad light is not unfairly prejudicial . . . ." *United States v. Sanders*, 95 F.3d 449, 453 (6th Cir. 1996). "It is well settled that a trial judge's discretion in balancing the probative value of evidence against its potential for unfair prejudice is very broad." *United States v. Bilderbeck*, 163 F.3d 971, 978 (6th Cir. 1999). We have emphasized that "[i]f judicial self-restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *United States v. Zipkin*, 729 F.2d 384, 390 (6th Cir. 1984) (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978)).

Deitz first argues that the admission of evidence of various witness' membership in the Witness Protection Program "had absolutely no relevance to the drug conspiracy charge against the three defendants in the second trial," or to "Deitz's alleged involvement in the 1993 Iron Horseman clubhouse shooting." (Deitz Br. 45.) Because the information regarding various witness' membership in the Witness Protection Program was never the subject of a Rule 403 objection, we review Deitz's claim for

plain error. *See Puckett*, 129 S. Ct. at 1425 (outlining the elements of the plain-error test).

We specifically considered the relevance of testimony regarding the Witness Protection Program in *United States v. Adamo*, 742 F.2d 927, 944-46 (6th Cir. 1984). There, defendants appealing their convictions for participation in a narcotics conspiracy alleged that the prosecutor should have been barred from eliciting testimony regarding various witnesses' participation in the program. *Id*. at 944. They asserted that the implication of such testimony would be that "their testimony must be truthful because they would neither need nor be afforded protection [from appellants] if they were the source of false information." *Id*. We determined that the testimony at issue did not prejudice the defendants and declined to impose a hard-and-fast rule about whether such testimony is admissible, but we expressed our disapproval of such references by a prosecutor when the need for protection "is not obvious, relevant, nor made an issue by defense counsel, and we encourag[ed] trial judges to instruct such witnesses not to refer to their participation in the program when testifying before the jury." *Id*. at 945. We explained that a reference to the program could "[r]aise negative inferences against the defendant if great care is not employed." *Id*. at 945 n.25. Other courts have expressed similar concerns, and have determined that such references are admissible as long as they do not directly implicate the defendant as a source of threats to the witness. *See United States v. Vastola*, 899 F.2d 211, 235 (3d Cir. 1990) (noting that "the potential for prejudice is slight where [a witness's testimony about his participation in the Witness Protection Program] only vaguely suggests that the witness was placed in the program because of threats emanating from the defendant"); *see also United States v. Martino*, 648 F.2d 367, 387-88 (5th Cir. 1981) (determining that a witness's participation in the Witness Protection Program may be elicited so long as the prosecution does not raise an inference of threat from the defendant); *United States v. Castleberry*, 642 F.2d 1151, 1153 (9th Cir. 1981) (holding that evidence of co-conspirator's participation in the Witness Protection Program was not so prejudicial as to require reversal).

Here, the evidence was relevant to the Outlaws' history of violence and reputed practice of retaliating against witnesses and informants. However, where the record reveals that the prosecutor never used the witness' participation in the Witness Protection Program to enhance their credibility, and did not try to imply that Deitz himself was threatening witnesses, the admission of the testimony was not prejudicial. *See United States v. Panas*, 738 F.2d 278, 285 (8th Cir. 1984) (explaining that where testimony revealed that defendant had introduced the witness to several drug dealers and witness had assisted in multiple investigations, his testimony about participating in the Witness Protection Program was not prejudicial because it clearly had not resulted solely from the witness's efforts to assist in the investigation at issue); *see United States v. Frankenberry*, 696 F.2d 239, 243 (3d Cir. 1982) (finding witness's statement about his participation in the Witness Protection Program was not prejudicial where the testimony was vague and did not indicate that a threat specifically emanated from defendant). This conclusion is further supported by the fact that the effect of any possible prejudice was dissipated where the district court specifically instructed the jury that it should consider the testimony of witnesses who "have received money and/or other things of value in exchange for their cooperation . . . with more caution than the testimony of other witnesses." (JA 1114). Therefore, the admission of this evidence was not plain error under Rule 403.

Deitz also contends that the admission of Dilts's testimony that another Outlaw, David Jack Hannum, had recounted assisting in slitting the throat of a suspected "snitch." At trial, the prosecution elicited testimony from Dilts detailing the Outlaws' regular practice of retaliating against witnesses and informants. When Dilts began to testify specifically about an the incident relayed to him by Hannum, defense counsel objected, stating, "I don't see any relevance as to these three defendants. This took place in Florida, involved David Jack [Hannum] and three other people, and it has nothing to do with the allegations set forth in the superseding indictment as it applies to these three defendants." (JA 583.) Defense counsel also voiced a specific concern about the graphic nature of the testimony. Although the court ultimately admitted the testimony, it instructed the prosecution not to "get into the details," and the prosecutor agreed to

"leave that [aspect of the testimony] out." (JA 585.) Ultimately, Dilts testified to the incident as follows:

> **Government:** Did Mr. Hannum indicate to you that he and others took some violent action toward an informant on an earlier occasion?
>
> **Dilts:** Yes.
>
> **Government:** Without getting into the details, what was it that Mr. Hannum said occurred?
>
> **Dilts:** That – while riding in the vehicle, that the passenger next to him they thought was a snitch. And one of the passengers in the back seat pulled his head back, and the other passenger beside him cut his throat.
>
> **Government:** Did Mr. Hannum indicate that the person did, in fact, die?
>
> **Dilts:** Yes.
>
> **Government:** Did he indicate what they did with the body?
>
> **Dilts:** Yes. He said they stopped on a bridge on the way down to Florida and threw it over the bridge.

(JA 586-87.)

Because Deitz objected to the testimony as being irrelevant under Federal Rule of Evidence 401 rather than being unfairly prejudicial under Rule 403, he has forefeited his prejudice argument for appeal, and we, therefore, review the argument for plain error. *See Puckett*, 129 S. Ct. at 1425 (outlining the elements of the plain-error test). Although the testimony at issue could be considered inflammatory, it did not undermine the integrity of Deitz's trial. Furthermore, the testimony was merely cumulative of the myriad of details the jury heard throughout the trial about the OMC's history of and propensity toward violence against informants and others, and the district court minimized the prejudice to Deitz by directing the government to omit the more gruesome details of the incident. *See, e.g.*, *United States v. Myers*, 280 F.3d 407, 414 (4th Cir. 2002) (noting that in a murder case, the court sought to minimize prejudice to the defendant by not allowing the government to show inflammatory photographs depicting the body or bloody scene and by requiring the government to obtain an advance ruling

before introducing any evidence depicting blood or any other indicia of violence). Thus, the admission of Dilts's testimony was not plain error.

As to Deitz's objections regarding the admission of the photographs of the "snitches are a dying breed" t-shirts, the seized drugs, and Deitz's Dayton OMC chapter t-shirt, it is not clear that Deitz objected to the admission of these items under Rule 403 at trial. Regardless, we find that Deitz's claim fails under either abuse-of-discretion or plain-error review. Given the significant evidence about the OMC's focus on retaliation against informants, the t-shirts were relevant to the charges at issue and not so prejudicial that their admission should have been barred by the district court. Moreover, the seized drugs and the Dayton chapter t-shirt were relevant to and probative of Deitz's participation in the charged offense, especially in light of Deitz's claim that he was no longer associated with the OMC. Because the evidence's probative value was not substantially outweighed by the "danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence," Fed. R. Evid. 403, its admission was not an abuse of discretion.

### 3.     *The narcotics and firearms conspiracy counts were not misjoined*

Deitz contends that the joinder of Counts 1 and 2, the narcotics and firearms conspiracy charges, constitutes reversible error because the government lacked a reasonable expectation of producing evidence to justify joinder, the government used the firearms conspiracy count as a means to prosecute Deitz for an otherwise time-barred offense, and the spillover effect of unrelated firearms evidence from the retroactive misjoinder unfairly prejudiced Deitz. Count 2, the firearms conspiracy, states that from about 1990 on, various Outlaws conspired "to use and carry firearms, deadly weapons, dangerous weapons, and devices during and in relation to the commission of the drug trafficking crime . . . in connection with their cocaine, marijuana, methamphetamine, and valium distribution operation." (JA 380-81.) Count 2 also notes that it was the purpose of the conspiracy that the defendants would carry out and use firearms in connection with crimes of violence.

Federal Rule of Criminal Procedure 8(a) ("Rule 8(a)") sets forth the conditions under which multiple offenses may be joined in a single indictment:

Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

Fed. R. Crim. 8(a). Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment. *See United States v. Frost*, 125 F.3d 346, 389 (6th Cir. 1997). In most cases, the absence of evidence at trial linking two sets of charges results in misjoinder only if the indictment was drawn up in bad faith—*i.e.* where the government knew it could not prove a link between the charges at trial. *Callanan v. United States*, 881 F.2d 229, 235-36 (6th Cir. 1989). Misjoinder is a question of law that we review de novo. *See Frost*, 125 F.3d at 389. We have held that Rule 8(a) "should be construed in favor of joinder," but "it is also true that failure to meet the requirements of this rule constitutes misjoinder as a matter of law." *United States v. Hatcher*, 680 F.2d 438, 440 (6th Cir. 1982).

Federal Rule of Criminal Procedure 14(a) ("Rule 14(a)") permits the court to sever joined offenses where "consolidation for trial appears to prejudice a defendant." *See* Fed. R. Crim. 14(a). However, under Federal Rule of Criminal Procedure 12(b)(3)(D) ("Rule 12(b)(3)(D)"), a defendant who fails to move for severance under Rule 14(a) prior to trial waives his objection. *United States v. Rox*, 692 F.2d 453, 454 (6th Cir. 1982). Thus, because the record reveals that Deitz failed to file a Rule 14(a) motion prior to trial, he waived his objection.

Moreover, even if Deitz had timely raised the misjoinder issue, his claim still fails. Rule 14(a) requires that the counts in an indictment be severed only when the defendant demonstrates that he will be prejudiced by the joinder of the charges. *See Rox*, 692 F.2d at 454 ("A defendant is prejudiced if the jury would be unable to keep the evidence from each offense separate and unable to render a fair and impartial verdict on

each offense."); *but see United States v. Sutton*, 605 F.2d 260, 271 (6th Cir. 1979) (explaining that "[a] risk of prejudice, either from evidentiary spillover or transference of guilt, inheres in any joinder of offenses or defendants").  Here, where the jury convicted Deitz on Count 1 but chose to acquit him on Count 2, and acquitted Heckman altogether, the jury's verdict demonstrates that it made an individualized determination of each defendant's guilt as to each count.  *See United States v. Bibby*, 752 F.2d 1116, 1122 (6th Cir. 1985) (citing acquittal on misjoined charges as evidence that the defendant was not prejudiced by the joinder); *United States v. Warner*, 690 F.2d 545, 553 (6th Cir. 1982) (noting that the jury's verdict acquitting defendant of the substantive count and convicting co-defendant of a lesser included offense demonstrated that the jury followed the court's instructions to make individualized determinations of each defendant's guilt as to each count).  Further, where the narcotics and firearms conspiracies are inextricably linked by defendants' participation in and association with the OMC, they are appropriately "connected with or constitut[ing] parts of a common scheme or plan."  Fed. R. Crim. 8(a); *see United States v. Price*, 265 F.3d 1097, 1105 (10th Cir. 2001) (stating that where defendants possessed the firearms at issue to carry out their drug trafficking, joinder of the firearms and drugs counts was proper).  Accordingly, Deitz has clearly failed to make the requisite "strong showing of prejudice" required to warrant reversal.

We also reject Deitz's argument that the government used Count 2 of the superseding indictment (the firearms conspiracy count) as a "sham pleading device" to prosecute Deitz for the otherwise time-barred September 18, 1993 shooting at the Anderson, Indiana clubhouse of the Iron Horsemen, a rival motorcycle gang.  Deitz contends that the sole allegation connecting Deitz to the firearms conspiracy count is that he participated in this drive-by shooting, and that the government lacked a good faith belief that this allegation was sufficient to demonstrate an agreement by Deitz embracing a continuing series of § 924(c) firearm violations by other members within the limitations period.  Deitz asserts that because the five-year statute of limitations for trafficking firearms expired in 1998, the government used the conspiracy count as a "sham pleading" device in an effort to "resurrect" Deitz's irrelevant 1993 offense.  He

further argues that the government failed to prove that the conspiracy continued into the period not barred by the statute of limitations because Bloor's trial testimony about this shooting suggested that it had "developed spontaneously" and was an isolated event.

Despite Deitz's contention, the Iron Horsemen shooting is relevant to the firearms conspiracy because it is directly connected to Deitz's membership in and continuing involvement with the OMC, who were known for their retaliatory violence against rival clubs. Moreover, Deitz adduced no evidence that he withdrew from the lengthy narcotics conspiracy following the 1993 shooting. We have previously held that where a conspiracy is ongoing, a conspirator is liable for the acts of his co-conspirators during the relevant statute of limitations period unless he "is found to have withdrawn from a conspiracy," *i.e.*, "[w]here he or she made a full confession to authorities or communicated to his co-conspirators that he has abandoned the enterprise and its goals." *United States v. Brown*, 332 F.3d 363, 374 (6th Cir. 2003) (internal citations omitted). Merely ceasing activities on behalf of the conspiracy does not constitute withdrawal. *Id.* Deitz argues that the fact that he was not in good favor with Wheeler because Wheeler had rejected Deitz's plan to sell methamphetamine constitutes his "withdrawal." But without evidence of an affirmative act conveying such withdrawal, Deitz's deteriorating relationship with Wheeler is not enough. *See id.* Therefore, given that Deitz was a part of the narcotics conspiracy during the relevant limitations period, the government's inclusion of the 1993 Iron Horsemen shooting in the indictment was proper.

Finally, Deitz argues that regardless of whether the joinder was proper initially, he was unfairly prejudiced by "retroactive misjoinder" and the resulting "spillover" of otherwise inadmissible evidence. Specifically, he asserts that the "government used the firearms conspiracy count as its justification for introducing a plethora of testimony and exhibits regarding the presence, carrying, and use of firearms which would not otherwise be admissible in a drug conspiracy prosecution." (Deitz Br. 43.) Again, Deitz's claim fails.

"Retroactive misjoinder" occurs where "joinder was proper initially because of a conspiracy allegation, but where later developments, such as the district court's

decision in [the] case months later to set aside [a defendant's] conspiracy conviction, appear to render the initial joinder improper." *Warner*, 690 F.2d at 553. We have previously noted that "retroactive misjoinder" cases are governed by the same standards as are applied in any case of prejudicial joinder. *Id.* (citing *Schaffer v. United States*, 362 U.S. 511 (1960) (holding that the propriety of a joint trial is governed by the same standards as applied in any case in which prejudicial joinder is alleged)). Further, we have explained that "[c]laims of prejudicial misjoinder only succeed when 'the defendant makes a showing of compelling prejudice' or 'the prosecutor acted in bad faith in bringing the initial conspiracy charge'. . . The burden of showing prejudice is 'very heavy.'" *Goldsby v. United States*, 152 F. App'x 431, 439 (6th Cir. 2005) (quoting *Warner*, 690 F.2d at 554) (holding that defendant failed to meet his burden of demonstrating prejudicial misjoinder where he "merely allege[d] that 'the jury could have easily lost its way. . .'"). Deitz's undeveloped argument that he was prejudiced by the admission of testimony about the Outlaws' use of firearms is insufficient to meet his heavy burden of demonstrating "compelling prejudice" where we found that there is sufficient evidence to sustain Deitz's conviction on the narcotics conspiracy count. *See United States v. Bowker*, 372 F.3d 365, 385 (6th Cir. 2004) (holding that "non-specific assertions of prejudice are insufficient to warrant severance"). We therefore reject Deitz's misjoinder claims.

### 4. *Any prosecutorial misconduct occurring at trial was harmless error*

Deitz next contends that various incidents of prosecutorial misconduct and government overreaching occurring at trial warrant the reversal of his conviction. Where a defendant objects at trial, we review the claims of prosecutorial misconduct de novo. *United States v. Kuehne*, 547 F.3d 667, 687 (6th Cir. 2008). "[T]o determine whether a prosecutor engaged in misconduct, [we first] must consider 'whether the prosecutor's conduct and remarks were improper.'" *Id.* (quoting *United States v. Carter*, 236 F.3d 777, 783 (6th Cir. 2001)). If the conduct was improper, we then determine "whether the improprieties were flagrant such that a reversal is warranted." *Id.* at 687-88 (citing *Carter*, 236 F.3d at 783). In considering whether a prosecutor's conduct was

flagrant, we ask whether: (1) the conduct or remarks in question tended to mislead the jury or prejudice the defendant; (2) the conduct or remarks were isolated or extensive; (3) the conduct or remarks were deliberate or accidental; and (4) the evidence against the defendant was strong. *Id*. at 688; *see also United States v. Monus*, 128 F.3d 376, 394 (6th Cir. 1997). "Flagrantly improper remarks by the prosecution must be reversed . . . [and] prosecutorial misconduct may be so exceptionally flagrant that it constitutes plain error, and is grounds for reversal even if the defendant did not object to it." *Kuehne*, 547 F.3d at 688 (internal citations omitted). If the challenged remarks are not flagrant, however, reversal is warranted only "if proof of the defendant's guilt was not overwhelming, the defendant objected to the improper remarks, and the court failed to cure the error with an admonishment to the jury." *Id*. (quoting *United States v. Stover*, 474 F.3d 904, 915 (6th Cir. 2007)).

Deitz contends that the government engaged in misconduct by: (1) improperly referring to hearsay and impeachment evidence during closing argument; (2) misstating the facts to introduce a new theory of conspiratorial liability during closing argument; and (3) misstating the law regarding buyer-seller transactions. We consider each of Deitz's arguments below.

> a. *The prosecutor did not improperly use hearsay and impeachment evidence during closing argument*

First, Deitz claims that the government improperly referred to hearsay and impeachment evidence during closing argument to argue that the cocaine seized from Deitz's borrowed car in 1991 had been given to him by members of the Dayton chapter. Specifically, Deitz objects to the following statement by the prosecution: "Do you think [the events of March 20 and 21, 1991 were] just a big coincidence? Just a big coincidence that the informant said he was going to pick up a load, and then, lo and behold, when he's stopped, there's the cocaine?" (JA 1133.) Deitz asserts that the government's statement improperly asked the jury to infer that the cocaine seized from the car was provided by a member of the Dayton chapter and that the remarks prejudiced Deitz by substantially increasing the probability that the jury would convict Deitz of conspiracy.

Because Deitz did not object to the statement during trial, we review the prosecutor's conduct for plain error. *See United States v. Combs*, 369 F.3d 925, 938 (6th Cir. 2004); *see Puckett*, 129 S. Ct. at 1425. Under this standard, the prosecutor's remarks do not warrant the reversal of Deitz's conviction because, as we have noted earlier, the evidence to which the government was referring was properly admitted to show the background of the government's surveillance of Deitz.

Second, Deitz claims that the government prejudiced him during closing argument by encouraging the jury to use certain trial testimony by Kinser to infer that Deitz was still closely associated with the Outlaws as late as 2002 or 2003. At trial, the court overruled defense counsel's objection to a tape recording of a telephone conversation between Kinser and James Fowler, a fellow Outlaw, reasoning that the government had properly used it only to challenge Kinser's credibility. Deitz asserts that rather than using the evidence merely to challenge Kinser's credibility, the prosecutor used the evidence in support of its case-in-chief, when he made the following statement during closing argument:

> In that particular tape Mr. Kinser is indicating that Deitz's "shit" . . . was with his wife while he was in there [*i.e.* prison], suggesting *if not outright proving* that Mr. Deitz was still associated with the Outlaws at that point. . . Mr. Kinser is talking about Mr. Deitz's wife having his colors while Mr. Deitz was in prison. What I submit to you, ladies and gentlemen, is that indicates a continued association of Mr. Deitz with the Outlaws.

(JA 1145, 1147.)

Again, because Deitz failed to object to this remark during trial, we review it for plain error. *Combs*, 369 F.3d at 938. And again, Deitz's argument fails because to the extent that the prosecutor's comments sought to use the conversation for purposes other than impeachment, the prosecution's remarks were isolated, occurring primarily during closing argument at the conclusion of a lengthy trial. *See United States v. Carroll*, 26 F.3d 1380, 1383 (6th Cir. 1994) (holding that improper comments warrants reversal only "where the error is so plain that 'the trial judge and prosecutor were derelict in countenancing it'"); *Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (citing *United*

*States v. Solivan*, 937 F.2d 1146, 1155 (6th Cir. 1991) (prosecutorial misconduct was "isolated to one portion of the trial, closing argument")). In addition, the trial court employed limiting instructions to rectify the improper remarks and explained to the jury that counsel's argument were not evidence. *See Wilson v. McMacken*, 786 F.2d 216, 219 (6th Cir. 1986) (concluding that defendant could not establish prejudice where trial judge provided jury with limiting instruction before and after prosecutor's closing argument containing contested statements). Given that "juries are presumed to understand and follow directions from the court," *Carter*, 236 F.3d at 787, we conclude that the prosecutor's statements did not "confuse or improperly influence" the jury.

>   b.      *The prosecutor's alleged misrepresentation of facts during closing argument does not amount to prosecutorial misconduct*

Next, Deitz asserts that the government improperly introduced a "new theory of conspiratorial liability" during its closing argument, claiming that Deitz conspired with a group of Outlaws to sell methamphetamine out of the Louisville clubhouse. Specifically, Deitz objects to the following remarks:

>   **Government:** . . . In fact, the truth was that Deitz continued to hang out and associate with the Outlaws in 2002, 2003, and continued to be part of the conspiracy that is charged in this particular case.
>
>   **Defense Counsel:** Your honor, there was no testimony that he was—he was in prison in 2002 and 2003.
>
>   **Government:** Well let me clarify . . . . [T]hat's why Mr. Kinser [president of the Louisville chapter] could not acknowledge that when he came in here [as a defense witness], that, in fact, Mr. Deitz continued to be a regular associate of the Outlaws.
>
>   And bear in mind, we're talking about the Louisville Outlaws, where methamphetamine dealers were a dime a dozen. There were quite a few of them, all involved in this conspiracy. All involved. And a consistent conspiracy on the part of members and associates of the Outlaws to sell drugs.

(JA 1146-47.)

Although he did not object at trial, Deitz now asserts that the admission of this argument was unfairly prejudicial because it allowed the government to "sidestep problems posed by" witness testimony that Wheeler had banned Outlaws from selling methamphetamine by suggesting to the jury that Deitz could still be guilty of the narcotics conspiracy if the jury found him guilty of conspiring to distribute methamphetamine with various Louisville Outlaws. Despite Deitz's assertions, the admission of the argument was not plain error. *See Combs*, 369 F.3d at 938. Throughout the trial, the government presented evidence that members and associates of the OMC participated in a conspiracy to buy and sell drugs, and Deitz's methamphetamine sales to Louisville chapter members fall within the realm of such a conspiracy.

      *c.*     *Though the government misstated the law regarding buyer-seller transactions, the error was harmless*

Deitz also claims that he was improperly prejudiced by the prosecutor's misstatement of law at closing regarding the ordinary "buyer-seller" defense to a drug conspiracy charge. During its closing argument, the prosecution told the jury that:

> **Government:** [The instructions] suggest[] that where there's totally a simple buyer/seller relationship between parties, that's not enough to establish a conspiracy. Of course, all of the law the Judge gives you, you have to apply and have to accept. But this particular concept only applies if the sale of the drugs was a one-time isolated event, and it only applies if these particular sales are completely unrelated to the conspiracy. We would submit to you that it does not apply in this case. Taking, for example, Mr. Heckman selling to Mr. Watkins. Clearly that was one course of this conspiracy. He sold methamphetamine on several occasions.

(JA 1150-51.) Defense counsel objected, arguing that the prosecution's statement made it appear that a buyer-seller relationship can be based on a single transaction, but the district court did not expressly rule on defense counsel's objection, choosing instead to admonish the jury that "they'll take the law from the instructions and not from the lawyers." (JA 1151.) Deitz now asserts that government's statement misled the jurors into believing that the existence of multiple transactions automatically precluded them from finding an ordinary buyer-seller relationship between Deitz and both Bloor and

Garland, and he argues that the district court should have given the jury an unambiguous correction of the instruction.

Although we have previously held that "evidence of repeat purchases provides evidence of more than a mere buyer-seller relationship," it is not true that a buyer-seller relationship can only exist if parties engage in a single isolated transaction. *See Brown*, 332 F.3d at 373 (stating that evidence of repeated drug purchases suggests more than a "mere buyer-seller relationship" and that evidence of transactions involving a large quantity of narcotics creates an inference of conspiracy). As noted above, an analysis of whether parties have more than a mere buyer-seller relationship involves the balancing of a number of factors, and is not simply determined by whether a sale was an isolated incident. *See Cole*, 59 F. App'x at 700 (citing *Rivera*, 273 F.3d at 755). Thus, we agree with Deitz's claim that the government's statement that the "buyer-seller" concept only applies where the sales in question are "one-time isolated" events and are "completely unrelated to the conspiracy" was incorrect.

Even if the government's statement misled the jury, however, any resulting error was harmless because it did not prejudice Deitz. The court instructed the jury that it should consider only the court-provided jury instructions in evaluating the case, and the parties do not challenge the accuracy of those instructions. Moreover, there was substantial evidence presented at trial that weighed against Deitz. *Monus*, 128 F.3d at 394. The bulk of the evidence established that, under the factors set forth in *Cole* (and *Rivera*), Deitz's relationship with the various witnesses was not merely a buyer-seller relationship. Thus, the government's misstatement of the law also does not warrant reversal.

5.     *Deitz's claim of "cumulative error" does not warrant reversal*

Deitz asserts that even if none of the aforementioned errors requires reversal on its own, when considered cumulatively "the combined effect of individually harmless errors [is] so prejudicial as to render his trial fundamentally unfair." *United States v. Trujillo*, 376 F.3d 593, 614 (6th Cir. 2004). However, cumulative-error analysis is not relevant where no individual ruling was erroneous. Other than the government's

misstatement of the law regarding buyer-seller relationships, there was no error, and no abuse of discretion in the admission of the challenged evidence. Therefore, cumulative error did not render Deitz's trial unfair.

**E.      Deitz's sentence was procedurally and substantively reasonable**

Deitz also asserts that his 144-month sentence was "unreasonable" because the district court erred in relying on the jury's special verdict to calculate the Base Offense Level, miscalculated his criminal history score, and failed to dismiss the specification of a prior drug abuse offense under 18 U.S.C. § 851 ("Proceedings to establish prior convictions").

We review the district court sentence for procedural and substantive reasonableness. *United States v. Crawford*, 281 F. App'x 444, 449 (6th Cir. 2008) (quoting *Gall v. United States*, 128 S. Ct. 586, 597 (2007)). Deitz does not specify whether he challenges his sentence on procedural or substantive grounds, but his contention that the district court improperly calculated the Guidelines range is procedural in nature, *see United States v. Moon*, 513 F.3d 527, 539 (6th Cir. 2008) (noting that whether a court correctly calculated the applicable Guidelines range is a question of procedural reasonableness), and his overall objection to his 144-month sentence appears to be a substantive challenge. *United States v. Vowell*, 516 F.3d 503, 512 (6th Cir. 2008) ("For a sentence to be substantively reasonable, it must be proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of [18 U.S.C.] § 3553(a).").

*1.      Deitz's sentence was procedurally reasonable*

When reviewing a sentence for procedural reasonableness, we must "ensure that the district court committed no significant procedural error, such as failing to calculate (or improperly calculating) the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence . . . ." *Moon*, 513 F.3d at 539

(citing *Gall*, 128 S. Ct. at 594). Our "reasonableness review focuses on the factors listed in [18 U.S.C.] § 3553(a), one of which is the Sentencing Guidelines themselves." *Id.* (citing *United States v. Duckro*, 466 F.3d 438, 442 (6th Cir. 2006)). A sentence may be procedurally unreasonable where the district court "fails to 'consider' the applicable Guidelines range or neglects to 'consider' the other factors listed in 18 U.S.C. § 3553(a), and instead simply selects what the judge deems an appropriate sentence without such required consideration." *Id.*

Deitz's primary argument is that the district court erred in its application of the United States Sentencing Guidelines ("U.S.S.G." or "Guidelines"). "[D]istrict courts are required to 'consult' the Guidelines as part of their consideration of the § 3553(a) factors. We have observed that 'a district court's misinterpretation of the Guidelines effectively means that it has not properly consulted [them].'" *Moon*, 514 F.3d at 539 (citing *United States v. Hazelwood*, 398 F.3d 792, 801 (6th Cir. 2005)).

The jury returned a special verdict attributing more than 50 grams but less than 500 grams of methamphetamine to Deitz. In its statement submitted to United States Department of Pretrial and Probation Services, the government based its calculation on the testimony of Bloor and Dilts, and the drugs found during the car stop in 1998, and found Deitz responsible for approximately 80 grams of methamphetamine. The Pre-Sentence Investigation Report ("PSR") recommended a Base Offense Level of 26. At sentencing, the district court heard the parties' arguments on drug quantity and assigned Deitz a Base Offense Level of 26 and a Criminal History Category of VI, corresponding to a Guidelines range of 120 months' to 150 months' imprisonment, ultimately sentencing Deitz to a term of 144 months.

We review the district court's application of the Sentencing Guidelines de novo and its findings of fact for clear error. *United States v. Davidson*, 409 F.3d 304, 310 (6th Cir. 2005). "A factual finding is clearly erroneous 'when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Moon*, 513 F.3d at 540 (quoting *Tran v. Gonzales*, 447 F.3d 937, 943 (6th Cir. 2006)).

a.      *The district court's reliance on the jury's special verdict as to drug quantity was proper*

Deitz first objects to the district court's determination of his Base Offense Level at 26, which corresponds to the finding attributing at least 50 grams but less than 500 grams of methamphetamine to Deitz. Deitz's argument is without merit. When sentencing a defendant within the statutory ceiling set by the jury's verdict, the district court may consider other facts, including acquitted conduct. *United States v. White*, 551 F.3d 381, 385 (6th Cir. 2008) (en banc). The district court's factual finding regarding drug quantity at sentencing was not clearly erroneous because the special jury verdict attributing more than 50 grams of methamphetamine to Deitz was reasonable under the circumstances.

b.      *The district court properly calculated Deitz's criminal history category*

Deitz contends that the district court erred by adding eight points to his criminal history for his convictions for misdemeanor offense occurring on September 8, 1988 and September 27, 1988. U.S.S.G. § 4A1.2(e)(2) provides that prior sentences imposed within ten years of the offense at issue are counted in computing the criminal history. The comments to the Guidelines provide that "the term 'commencement of the instant offense' includes any relevant conduct," *see* U.S.S.G. § 4A1.2 cmt. 8, where "relevant conduct" is "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity, that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense . . . ." U.S.S.G. § 1B1.3(a)(1)(B). Because the evidence shows that Deitz began participating in the narcotics conspiracy at least by 1991, the district court properly considered his 1988 convictions in calculating his Criminal History Category. *See United States v. Johnson*, 553 F.3d 990, 993-94 (6th Cir. 2009) (counting defendant's previous convictions within ten years of joining the alleged conspiracy as "relevant conduct" to calculate defendant's Criminal History Category).

> c. *The district court did not err in enhancing Deitz's sentence under 21 U.S.C. § 851*

Deitz's final argument is that the district court should have dismissed the information that had been filed under 21 U.S.C. § 851(a)(1), stating that Deitz was convicted of a felony drug offense in May 2000 (arising from the 1998 Kentucky traffic stop), because the government failed to prove that the transaction was part of the conspiracy. 21 U.S.C. § 851, "Proceedings to establish previous convictions," provides:

> [i]f the United States attorney files an information under this section, the court shall after conviction but before pronouncement of sentence inquire of the person . . . whether he affirms or denies that he has been previously convicted as alleged in the information, and shall inform him that any challenge to a prior conviction which is not made before sentence is imposed may not thereafter be raised to attack the sentence.

21 U.S.C. § 851(b). Where a defendant disputes the district court's determination of when he joined the conspiracy, rather than challenging the validity of a prior conviction, we review the issue for plain error. *Gibbs*, 182 F.3d at 408 (noting that government failed to show by a preponderance of the evidence that defendant was a member of the conspiracy at the time he was arrested for possession of narcotics and a firearm).

Deitz asserts that the sentencing enhancement was improper because "[t]he Government did not prove any conspiratorial activity by Deitz after his state trafficking convictions became final in the year 2000." (Deitz Br. 60.) We disagree. A co-conspirator is liable for the acts of his co-conspirators during the relevant statute of limitations period unless he "is found to have withdrawn from [the] conspiracy," *i.e.* "[w]here he or she made 'a full confession to authorities' or communicated to his co-conspirators 'that he has abandoned the enterprise and its goals.'" *Brown*, 332 F.3d at 373. Here, there is sufficient evidence to support the jury's finding that Deitz was a member of the conspiracy prior to the 1991 drug seizure. *See supra* Part II.B. Because Deitz has set forth no evidence establishing his affirmative withdrawal from the ongoing conspiracy prior to the 1998 drug seizure that resulted in his 2000 convictions, the district court's enhancement of his sentence on that basis was not plain error.

*d.    Conclusion*

Deitz does not challenge the district court's consideration of the § 3553(a) factors or its explanation of the rationale for his 144-month sentence. Therefore, reviewing the drug quantity, the enhancement, and the criminal history information properly before the court during sentencing, his sentence is procedurally reasonable.

*2.    Deitz's sentence is substantively reasonable*

A sentence must also be substantively reasonable, which means it must be "proportionate to the seriousness of the circumstances of the offense and offender, and sufficient but not greater than necessary, to comply with the purposes of § 3553(a)." *Vowell*, 516 F.3d at 512. We afford sentences within a properly calculated Guidelines range a rebuttable presumption of reasonableness. *United States v. Williams*, 436 F.3d 706, 708 (6th Cir. 2006). Deitz's sentence falls within the advisory Guidelines range of 120 months' to 150 months' imprisonment, so it is entitled to a rebuttable presumption of reasonableness. Deitz does not expressly challenge the substantive reasonableness of his sentence, but his claim that his 144-month sentence was "more than double the worst case scenario" discussed with the Government during plea negotiations could be construed as a challenge to the substantive reasonableness of his sentence. We find this argument unavailing.

The district court considered Deitz's objections to the PSR and his "lengthy" sentencing memorandum as well as the parties' arguments during the sentencing hearing. The district court also considered the fact that Deitz had long-time participation in criminal activities, stating:

> In amplifying my reasons for sentence further, I have considered the guidelines to be advisory and the statute, of course, to be mandatory. However, within those advisory guidelines of an additional zero to 30 months over the mandatory minimum of ten years or 120 months, I've considered the background of this defendant, and I believe that the guidelines are extremely reasonable in light of the facts which were adduced at trial, and the criminal history, and the reasons for the compilation of those criminal history points. I believe that without regard to the guidelines that Section 3553(a) is satisfied by my

sentencing to 144 months. I believe it to be reasonable in light of the conviction, the history of this defendant, the criminal history of this defendant, the findings of the jury, the need for incarceration for purposes of both rehabilitation and deterrence.

(JA 1182.)

Section 3553(a) requires district courts to consider "the nature and circumstances of the offense . . . .," 18 U.S.C. § 3553(a)(1), and demands that "the sentence imposed . . . reflect[s] the seriousness of the offense, [] promote[s] respect for the law, and [] provide[s] just punishment for the offense." *See* 18 U.S.C. § 3553(a)(2)(A). "Under *Booker* and its progeny, the sentencing choices available to the district courts in meeting the requirements of § 3553(a)(2) have 'significantly broadened.'" *Moon*, 513 F.3d at 544 (citing *Gall*, 128 S. Ct. at 602). Thus, the district court's ability to weigh the factual circumstances surrounding the offense to determine the appropriate sentence is "paramount." *Id.* "In general, we must give 'due deference' to the district court's conclusion that the sentence imposed is warranted by the § 3553(a) factors. The fact that [we] might have reasonably concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." *United States v. Bolds*, 511 F.3d 568, 581 (6th Cir. 2007).

The district court's explanation adequately establishes that the court properly considered Deitz's significant criminal history and past violence and his association with a known criminal group in evaluating the seriousness of his offense, as well as the need to provide "just punishment" for the crime. *See*, *e.g.*, *Moon*, 513 F.3d at 544 (finding that court properly considered the impact of defendant's health care fraud on her patients in conducting the inquiry required by § 3553(a)). Therefore, Deitz has failed to rebut the presumption that his within-Guidelines sentence is substantively reasonable.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Deitz's conviction and sentence.