# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-3677

_____

| | | |
|---|---|---|
| United States of America, | * | |
| | * | |
| Appellee, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | Northern District of Iowa. |
| Todd Becker, | * | |
| | * | |
| Appellant. | * | |

_____

Submitted: May 15, 2008
Filed: July 25, 2008

_____

Before RILEY, HANSEN, and ARNOLD, Circuit Judges.

_____

RILEY, Circuit Judge.

After a jury convicted Todd Becker (Becker) of conspiracy to distribute five grams or more of actual methamphetamine (meth) within 1,000 feet of a protected location[1] and possession with intent to distribute five grams or more of actual meth within 1,000 feet of a protected location after previously being convicted of a felony

_____

[1] In violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 846, 851 and 860.

drug offense[2] the district court[3] sentenced Becker to 120 months imprisonment. On appeal, Becker contends (1) the district court erred in admitting evidence (a) obtained from his custodial interrogation and (b) from the subsequent warrantless search of his home, and (2) insufficient evidence supports his conviction. We affirm.

## I.    BACKGROUND

Following a November 1, 2005 conviction, Becker was placed on two years probation by the State of Iowa for possession of meth. As a condition of his probation, Becker agreed (1) not to use any illegal drugs; (2) not to have contact with persons known to be or suspected of being engaged in illegal drug use, manufacture or sale; (3) to "actively cooperate with, participate in, and complete any programs or services" as directed by his probation office; and (4) to submit to a search of his person, residence, and property "at any time, if reasonable suspicion exists, by a peace officer or probation/parole officer."

Becker violated his probation agreement in several ways. First, at the end of November 2005, Becker submitted a urine sample that tested positive for drug use. After the positive drug test, Becker was directed to obtain an evaluation and enter a treatment program within one month. Second, Becker's failure to enter a treatment program before his arrest on January 3, 2006, constituted another violation of his probation agreement. Finally, Becker also violated his probation agreement by having contact with his girlfriend, Lisa Severson (Severson), who was arrested in October 2005, and again on December 23, 2005, for possession of meth. Officer Brent Brass (Officer Brass), Severson's arresting officer in October and in December, observed Severson visiting Becker at Becker's home on several occasions in December 2005, both before and after Severson's December arrest.

---

[2]In violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(B), 851, and 860.

[3]The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

Severson and Becker started dating in the fall of 2005, and began using meth together shortly thereafter. During this time, Severson was using meth on a daily basis, obtaining the meth either from Becker or another source. Severson would also sell meth to others who inquired if she had any extra meth on hand.

Maggie Hoy (Hoy) began buying meth from Becker in the summer of 2005 and continued to do so for about one year, purchasing the meth in gram quantities on a weekly basis. Hoy became pregnant in January 2006 and stopped using meth until after her baby was born in September 2006, but Hoy's purchases continued, even increasing in quantity to three to four 8-balls[4] at a time. Hoy purchased crystalline meth (ice), not powder meth, from Becker.[5] Hoy sometimes paid cash, and sometimes Becker would front her the meth with the expectation Hoy would pay Becker back after she sold some of the meth. When Becker was not around, Hoy would pick up meth from Severson or Tom Becker (Tom), Becker's brother, who generally took over the meth business when Becker was not around. At times, Hoy would pay Severson or Tom the money she owed Becker for meth.

Severson sold meth to a number of people, including Matt Firsching (Firsching). Firsching used meth and purchased 50% to 75% of his meth from Severson. Firsching purchased meth from Severson more than twenty times in quantities as large as two 8-balls at a time. In total, Firsching estimated he purchased a total of approximately three ounces of meth from Severson. At times, Firsching would attempt to buy meth from Severson, but she would be out of meth. When this

---

[4]"An '8-ball' refers to one-eighth of an ounce, or 3.5 grams, of methamphetamine." United States v. Whirlwind Soldier, 499 F.3d 862, 867 n.2 (8th Cir. 2007).

[5]Methamphetamine generally comes in two forms: powder or crystalline form. The crystalline form is called "ice" and is a purer form of methamphetamine. To be called "ice" methamphetamine, the methamphetamine has to be at least 90% pure.

occurred, on occasion, Firsching would drive Severson to Becker's residence to acquire meth and then buying the meth from Severson.

Initially, Firsching found the quality of the meth bought from Severson to be good, but the quality declined over time. Firsching confronted Becker and Tom about the quality of the meth Severson was selling. Tom said he would take care of it and Becker nodded his head in agreement. After Becker was incarcerated in June 2006, Firsching began obtaining meth from Tom.

Officer Brass reported Severson's visits to Becker's residence to Becker's probation officer, Marc Borgman (Borgman). Based on the violations of the terms of Becker's probation agreement, Borgman believed reasonable suspicion existed justifying a search of Becker's residence.

On January 3, 2006, Borgman, accompanied by Officer Brass and Franklin County Sheriff's Deputy Jamie Sullivan (officers), went to Becker's residence intending to conduct a search of the premises. Borgman was wearing street clothes, while the officers were wearing polo shirts with their agency logos. Both officers were wearing sidearms. As Borgman and the officers approached Becker's residence, they encountered Becker exiting his garage. Borgman identified himself, and the officers asked Becker if they could return to the garage. When they entered the garage, Becker's brother Tom was present. The officers told Tom he could either empty his pockets for police protection or leave. Tom left.

Borgman then asked Becker if Borgman and the officers could look around the garage and residence, and Becker said he had no problem with that. In the house Borgman asked Becker to provide a urine sample and Becker complied. As Borgman and the officers approached each room in the house, Borgman asked Becker if they could look around or search. Becker accompanied Borgman and the officers as they searched the residence, agreeing to a search of each room. At no time was Becker handcuffed, restrained, threatened or promised anything.

-4-

Eventually, Borgman and the officers reached a room next to Becker's bedroom in which Borgman saw a safe. The safe was locked. Borgman asked Becker if he would open the safe. Becker agreed. Becker unlocked the safe using a key from a keychain on his jeans. Officer Brass bent down to look into the safe, detected the odor of marijuana, and saw a small bag of marijuana and some money bags in the safe. Officer Brass withdrew the bag of marijuana and observed a small bag of what appeared to be crystal meth. Becker was asked to open a locked money bag, and Becker complied by providing a key that unlocked the bag.

Becker was asked if anyone else possessed keys to the safe and Becker replied, "No." Borgman asked Becker whose drugs were in the safe and Becker replied the money was his, but the drugs were not. The officers placed Becker under arrest. The total time which elapsed from the first encounter with Becker outside the garage until the arrest was twenty to twenty-five minutes.

No Miranda[6] warnings were given to Becker until after his arrest. Further, throughout the search of the residence, Borgman usually used terminology such as "have a look around" rather than "search" when referring to the inspection of the Becker residence. On January 4, 2006, Borgman filed a violation report regarding Becker's violations of his probation agreement. This report did not allege Becker violated paragraph 13 of the agreement which prohibits Becker from having contact with known drug users.

Becker was indicted on June 7, 2006. A superseding two count indictment was returned by the grand jury on November 16, 2006, charging Becker with (1) conspiracy to distribute five grams or more of pure meth and 500 grams or more of a mixture of a substance containing a detectable amount of meth within 1000 feet of a school, after a prior felony conviction; and (2) possession with the intent to

---

[6]Miranda v. Arizona, 384 U.S. 436 (1966).

distribute five grams or more of pure meth within 1000 feet of a school, after having been previously convicted of a felony.

Becker filed a motion to suppress evidence arising from the search of his residence. After an evidentiary hearing, the magistrate judge[7] issued a report and recommendation denying Becker's motion, which the district court adopted. After a three-day trial, a jury found Becker guilty of both charges and responsible on each count for five or more grams of pure meth. The district court sentenced Becker to 120 months imprisonment on each count to run concurrently. This appeal follows.

## II.    DISCUSSION

Becker argues (1) the district court erred in admitting evidence obtained (a) from his custodial interrogation and (b) from the subsequent warrantless search of his home, and (2) insufficient evidence supports the jury's verdict.

### A.    Admission of Evidence

"We review for abuse of discretion the district court's evidentiary rulings. In a conspiracy trial, the district court's discretion in evidentiary rulings is particularly broad." United States v. Montano, 506 F.3d 1128, 1132 (8th Cir. 2007) (citing United States v. Dierling, 131 F.3d 722, 730 (8th Cir. 1997)).

Becker asserts, when the officers came to his home on January 3, 2006, to perform a search and question him about his drug use, he was effectively in custody and his consent to the search was obtained in violation of Miranda. On this basis, Becker seeks the suppression of any evidence derived from the search of his residence. The officers' search of Becker's residence was constitutional because (1) under the terms of Becker's probation, Becker agreed to submit to a search of his person, residence, and property "at any time, if reasonable suspicion exists, by a peace

---

[7]The Honorable Paul A. Zoss, United States Magistrate Judge for the Northern District of Iowa.

officer or probation/parole officer," and Borgman possessed reasonable suspicion of a probation violation; and (2) Becker consented to the search.

In the context of a probationary search condition, reasonable suspicion that the probationer has violated the terms of his probation is sufficient to justify a search. See United States v. Brown, 346 F.3d 808, 811 (8th Cir. 2003). "[W]hen a probationer is subject to a probationary search condition, the Fourth Amendment permits an officer to search pursuant to that [probationary] condition without a warrant based only upon that officer's reasonable suspicion that the probationer is violating his probation's terms." Id. at 811 (citation and footnote reference omitted). The officers possessed a reasonable suspicion Becker had violated the terms of his probation when (1) Becker tested positive for the use of illegal drugs, (2) Becker failed to enter a drug treatment program as directed by his probation officer, Borgman, and (3) Severson was seen on several occasions visiting Becker at his residence before and after Severson's December 23, 2005 arrest for possession of meth. The January 3, 2006 search of Becker's residence was constitutional because it comported with the terms of Becker's probation and was supported by the officers' reasonable suspicion that Becker had violated the terms of his probation.

The search also was constitutional because, in considering the totality of the circumstances, Becker voluntarily, and without coercion, consented to the search. See United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990) (addressing five characteristics to be considered in determining whether consent was voluntarily given: (1) defendant's age, (2) defendant's general intelligence and education, (3) whether defendant was under the influence of drugs or alcohol at the time, (4) whether defendant was informed of his Miranda rights, and (5) whether defendant had previous arrests and thus was already aware of his constitutional rights). Becker was a forty-nine year old high school graduate who did not appear to be under the influence of drugs or alcohol. While Becker was not read his Miranda rights before being asked for consent to the search, the facts, as found by the experienced district judge, demonstrate Becker was not in custody at that time. In addition, Becker had

eight prior convictions, including six involving jail sentences, suggesting Becker already was aware of his constitutional rights. Becker voluntarily consented to the search of his residence.

### B. Sufficiency of the Evidence

Becker asserts the government never proved Becker intentionally conspired with others to distribute five or more grams of meth, claiming the evidence supports nothing more than buyer-seller relationships. To convict Becker of a conspiracy to distribute meth, the government had to prove (1) the existence of a conspiracy, that is, an agreement to distribute drugs; (2) Becker knew of the conspiracy; and (3) Becker intentionally joined the conspiracy. See United States v. Rolon-Ramos, 502 F.3d 750, 754 (8th Cir. 2007). "We review de novo the sufficiency of the evidence to sustain a conviction, examining the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences." Montano, 506 F.3d at 1132 (citing United States v. Wintermute, 443 F.3d 993, 1003 (8th Cir. 2006)). "We will reverse the jury verdict only if no reasonable jury could have found [Becker] guilty." Id. (citing United States v. Sanders, 341 F.3d 809, 815 (8th Cir. 2003)).

In United States v. Pizano, 421 F.3d 707, 719 (8th Cir. 2005), we rejected this same argument after a careful review of the record. In Pizano, we found evidence of distribution of large amounts of drugs over more than two years where the drugs were fronted by the defendant constituted "ample evidence to support a reasonable juror's finding . . . [of] ongoing agreements . . . for the common purpose of distributing [drugs]." Id. at 720.

Here, the jury heard testimony from Firsching, Severson and Hoy. Firsching testified he obtained ice from Severson on over twenty occasions, sometimes after driving Severson to Becker's residence when she did not have any ice in her possession. Severson testified to obtaining ice from Becker and distributing it to Firsching and other customers. Hoy purchased crystalline meth, not powder meth,

from Becker. Hoy sometimes paid cash, and sometimes Becker would front Hoy the meth with the expectation Hoy would pay Becker back after she sold some of it. When Becker was not around, Hoy would pick up meth from Severson or Tom, who generally took over the meth business when Becker was not available. Hoy would also sometimes pay the money she owed Becker for meth to Severson or Tom. While Hoy also used meth, she testified she stopped using for nine months while pregnant, but actually bought more meth each week during her pregnancy even though she was not using any of the meth personally. Like in Pizano, ample evidence supported the jury's finding a conspiracy existed. See id. at 719-20.

## III. CONCLUSION

We affirm.

_____