******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* NEMIAH ALLAN
(SC 18879)

Rogers, C. J., and Norcott, Palmer, Zarella and McDonald, Js.*

*Argued September 24, 2013—officially released January 28, 2014*

*Katherine C. Essington*, assigned counsel, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *James R. Dinnan*, senior assistant state's attorney, for the appellee (state).

*Opinion*

McDONALD, J. Today we consider what evidence is necessary to support a conviction for conspiracy to sell narcotics in the context of a buyer-seller relationship between the alleged coconspirators. Following our grant of certification, the defendant, Nemiah Allan, appeals from the judgment of the Appellate Court affirming his judgment of conviction of conspiracy to sell narcotics by a person who is not drug-dependent in violation of General Statutes §§ 53a-48 and 21a-278 (b),[1] and interfering with an officer in violation of General Statutes § 53a-167a. On appeal, the defendant claims that the Appellate Court improperly concluded that the evidence was sufficient to support his conspiracy conviction because: (1) the evidence established nothing more than his attempted purchase of narcotics on a single occasion from his alleged coconspirator; and (2) had the Appellate Court adopted the "buyer-seller exception" applied by the federal courts in evaluating the sufficiency of the evidence of conspiracy to sell narcotics, as he had requested, it would have concluded that the trial court improperly denied his motion for a judgment of acquittal on that charge. We conclude that the considerations embodied in this so-called exception are already reflected in our law. We further conclude that the evidence demonstrated more than a mere buyer-seller relationship on a single occasion to support the defendant's conspiracy conviction. Therefore, we affirm the judgment of the Appellate Court, although on different grounds from those articulated by that court.

In reaching its verdict, the jury reasonably could have found the following facts. On the evening of April 15, 2009, officers of the Meriden Police Department conducted surveillance at the corner of West Main Street and Randolph Avenue in Meriden after receiving complaints of drug activity in that area. From their unmarked vehicles, the surveillance team observed the defendant engaging in the following conduct that, in their experience, was consistent with drug dealing. The defendant walked back and forth near the corner of West Main Street and Randolph Avenue while talking on his cell phone. Police officers observed several vehicles periodically stop at this corner, at which point the defendant approached these vehicles, reached inside, and conducted "some sort of transaction" with the vehicles' occupants. Then, while the vehicles idled at this corner, the defendant walked a short distance away to a house located at 20 Maple Branch, just off Maple Street. That house was the subject of a separate police investigation due to neighbors' complaints about drug dealing occurring on its second floor. From the complaints and subsequent surveillance, the police suspected that this residence served as a "stash house," as drug dealers commonly keep their drugs and money

at a location near to where they conduct their drug transactions so as to avoid having any evidence of drug activity on their person in the event of a police stop. Shortly after entering the second floor of the house, the defendant exited the house and returned to the particular vehicle waiting at the street corner. Moments later, the driver of the vehicle would drive away, while the defendant remained at the corner.

During one of these interactions, the officers observed the defendant walk away from a van with money in his hand, which they did not see him possess when he initially approached it. In light of this additional information, once the van departed, the surveillance officers radioed officers in a police cruiser in an effort to stop the van. Upon stopping the van, the driver, Humberto Zarabozo, cooperated with the police and told them that he had just purchased crack cocaine from the defendant and that he had purchased narcotics from the defendant in the past.[2] The officers recovered crack cocaine from the floor of Zarabozo's van. Subsequently, the officers returned to the surveillance area, where they continued to observe the defendant engaging in similar conduct with approaching vehicles, although the officers did not specifically observe any objects exchanged between the defendant and the occupants of these vehicles.

Soon thereafter, the officers observed the following incident. A tan Acura drove along West Main Street past the corner where the defendant had been meeting vehicles, turned onto Maple Street, and then turned again onto Maple Branch. As the Acura drove toward this location, the defendant crossed West Main Street and walked up Maple Street while talking on his cell phone. The Acura turned around and parked in close proximity to 20 Maple Branch, facing Maple Street. As the defendant approached Maple Branch, the driver of the Acura flashed the car's front lights and then turned off the driving lights while leaving the parking lights on. In response to these signals, the defendant approached the passenger side of the vehicle. He then opened the passenger door and leaned into the vehicle. Moments later, the defendant emerged from the Acura and returned to his corner as the Acura drove away. Following their unsuccessful pursuit of the Acura, the officers returned one to two hours after this incident to arrest the defendant.

The officers took the defendant into custody despite his efforts to resist arrest, gave him *Miranda*[3] warnings, and conducted a search of his person, which yielded no drug related materials. When the officers asked the defendant about the driver of the Acura, he informed them that the driver's name was "Fleet" and that Fleet was a drug supplier from Waterbury. The officers knew the name Fleet as a street level drug supplier, but did not know his real name. The defendant further told

them that Fleet had driven to Maple Branch to "resupply" him with crack cocaine. Despite this plan, the defendant told the police that Fleet had not delivered the narcotics when they met earlier that evening. The defendant then opened his cell phone and gave the police Fleet's cell phone number, which was the last outgoing call made from the defendant's cell phone.

When the defendant overheard a police radio transmission indicating that the owner of the Acura was Brandy Clayton, the defendant identified her as Fleet's girlfriend. The officers drove the defendant to a gas station where Clayton was located and from which she reported her vehicle was stolen. The defendant positively identified Clayton as Fleet's girlfriend. Around this time, the police learned that Fleet's actual name is Kareem Thomas. When the police subsequently found Thomas hiding in the house of Clayton's sister, they confirmed that the phone number of the cell phone found on Thomas' person was the number that the defendant had last dialed.

Thereafter, while the defendant was being processed at the police station, he asked the booking officer what had happened to "the big fat white guy." When the booking officer asked the defendant to whom he was referring, the defendant replied "the one that I sold drugs to," presumably referring to Zarabozo, who matched the defendant's description. One or two weeks after the defendant's arrest, the police executed a search warrant for the second floor apartment at 20 Maple Branch, where they seized crack cocaine packaged for street sale and arrested another individual in connection with that seizure.

The state charged the defendant with sale of narcotics by a person who is not drug-dependent in violation of § 21a-278 (b), sale of narcotics within 1500 feet of a school in violation of General Statutes § 21a-278a (b), possession of narcotics in violation of General Statutes § 21a-279, conspiracy to sell narcotics by a person who is not drug-dependent in violation of §§ 53a-48 and 21a-278 (b), and interfering with a police officer in violation of § 53a-167a (a). At the conclusion of the state's case, the defendant moved for a judgment of acquittal, which the trial court denied. The jury returned a verdict finding the defendant guilty of conspiracy to sell narcotics by a person who is not drug-dependent and interfering with a police officer and finding him not guilty of the other charges. The court rendered judgment in accordance with the jury's verdict, and sentenced the defendant to a total effective term of twelve years imprisonment followed by five years special parole.

The defendant appealed from the trial court's judgment to the Appellate Court, and claimed that there was insufficient evidence to allow the jury to find him guilty beyond a reasonable doubt of the crime of conspiracy to sell narcotics in violation of his right to due

process. *State* v. *Allan*, 131 Conn. App. 433, 435, 437–38, 27 A.3d 19 (2011). The Appellate Court rejected the defendant's argument that the state had the burden of proving that the defendant and his coconspirator, Thomas, had entered into an agreement "in the past to distribute narcotics or to distribute narcotics in the future," concluding that the defendant misunderstood the required elements of the crime charged under Connecticut law. Id., 439–40. The Appellate Court further declined the defendant's invitation to apply what he called the "buyer-seller exception" applied by the federal courts in evaluating the sufficiency of evidence to support a conviction of conspiracy to sell narcotics, noting that the defendant had not provided the court with a single Connecticut case endorsing such an exception. Id., 441. After concluding that the evidence was sufficient to support the conspiracy conviction, the Appellate Court affirmed the judgment of the trial court. Id., 443.

Thereafter, we granted the defendant's petition for certification to appeal to this court, limited to the following issue: "Did the Appellate Court correctly refuse to adopt the buyer-seller exception to a charge of conspiracy to sell drugs?" *State* v. *Allan*, 302 Conn. 949, 31 A.3d 383 (2011). On appeal, the defendant urges us to adopt the buyer-seller exception that has been uniformly recognized by the federal courts, as well as several state courts, as part of our conspiracy jurisprudence. In doing so, the defendant asserts that, without this exception, every drug sale or attempted drug sale in Connecticut could be prosecuted as a conspiracy. He further argues that such a result would frustrate the legislative intent of our narcotics laws, in which there are more severe sanctions for the sale or distribution of narcotics than for mere possession or attempted possession. The defendant underscores that he is not challenging the jury instructions; in other words, he is not contending that the trial court should have instructed the jury on the buyer-seller exception. Instead, he contends that this court should apply this exception as part of a sufficiency of the evidence inquiry, consistent with the general practice of the federal courts.[4] As such, he contends that his motion for a judgment of acquittal on the ground of insufficient evidence preserved this issue for appeal. Moreover, the defendant claims that application of this exception to the present case would reveal that there is insufficient evidence to find a conspiracy to sell narcotics because the evidence establishes no more than his attempt to purchase narcotics from Thomas on a single occasion.

In response, the state argues that there is no need for this court to adopt the principle that the defendant seeks to engraft onto our law because it already effectively exists.[5] Specifically, the state argues, the well established contours of Connecticut law for determining whether there is sufficient evidence to support a

conspiracy conviction, along with a proper jury instruction on the elements of conspiracy, ensure that a mere buyer of narcotics will not be convicted as a coconspirator. Additionally, because our laws make a distinction between suspects involved in all aspects of the illegal drug trade, reserving the harshest sentences for professional drug dealers, the state contends that it would not charge a mere buyer with distribution related crimes. As such, the state claims that the evidence in this case supports a finding that the defendant agreed with Thomas to participate in a drug distribution plan as a seller, rather than merely to purchase narcotics. We agree with the state.

I

We begin with the defendant's claim that, in evaluating whether there is sufficient evidence to support a conviction of conspiracy to distribute narcotics, Connecticut should apply the buyer-seller "exception." In order to address this claim, we first examine the requirements to establish a conspiracy under Connecticut law and then consider the parameters for sufficient evidence for the comparable offense under federal law in the context of a buyer-seller relationship. As this analysis reveals, the so-called buyer-seller exception on which the defendant relies is not, in our view, properly viewed as an *exception* to federal conspiracy law, but, rather, a proper application of fundamental principles of conspiracy jurisprudence that are shared by this state.

Conspiracy is the unlawful act of agreeing to commit a crime. See *State* v. *Beccia*, 199 Conn. 1, 3, 505 A.2d 683 (1986). It has long been recognized as a separate and distinct offense from the commission of the substantive offense that is the object of the agreement. Id. "That agreement is a distinct evil, which may exist and be punished whether or not the substantive crime ensues." (Internal quotation marks omitted.) *United States* v. *Jimenez Recio*, 537 U.S. 270, 274, 123 S. Ct. 819, 154 L. Ed. 2d 774 (2003); see *State* v. *Beccia*, supra, 3 ("[t]he gravamen of the crime of conspiracy is the unlawful combination and an act done in pursuance thereof, not the accomplishment of the objective of the conspiracy" [internal quotation marks omitted]). As criminals united with a common purpose pose a potentially greater danger to the public than an individual acting in isolation, conspiracy is anticipatory and aimed not at the unlawful object, but at the process of agreeing to pursue that object. See *State* v. *Beccia*, supra, 3; *State* v. *Jones*, 44 Conn. App. 338, 343, 689 A.2d 517, cert. denied, 240 Conn. 929, 693 A.2d 301 (1997).

To establish the crime of conspiracy in Connecticut, the state must prove that there was an agreement between two or more persons to engage in conduct constituting a crime and that the agreement was followed by an overt act in furtherance of the conspiracy.

General Statutes § 53a-48 (a). "Conspiracy is a specific intent crime, with the intent divided into two elements: (a) the intent to agree or conspire and (b) the intent to commit the offense which is the object of the conspiracy. . . . Thus, [p]roof of a conspiracy to commit a specific offense requires proof that the conspirators intended to bring about the elements of the conspired offense." (Citation omitted; internal quotation marks omitted.) *State* v. *Padua*, 273 Conn. 138, 167, 869 A.2d 192 (2005). Accordingly, when the charged object of the conspiracy is to sell or distribute narcotics, the state is required to prove two distinct elements of intent: (a) that the conspirators intended to agree and (b) that they intended for narcotics to be sold to another person. *State* v. *Hernandez*, 28 Conn. App. 126, 134–35, 612 A.2d 88, cert. denied, 223 Conn. 920, 614 A.2d 828 (1992). "The existence of a formal agreement between the parties need not be proved; it is sufficient to show that they are knowingly engaged in a mutual plan to do a forbidden act. . . . Consequently, it is not necessary to establish that the defendant and his coconspirators signed papers, shook hands, or uttered the words we have an agreement. . . . [T]he requisite agreement or confederation may be inferred from proof of the separate acts of the individuals accused as coconspirators and from the circumstances surrounding the commission of these acts." (Citations omitted; internal quotation marks omitted.) *State* v. *Patterson*, 276 Conn. 452, 462, 886 A.2d 777 (2005).

With the exception that federal law does not require proof of an overt act in furtherance of a conspiracy to violate its narcotics laws, federal conspiracy law generally reflects the same fundamental requirements as Connecticut law.[6] *United States* v. *Shabani*, 513 U.S. 10, 15, 115 S. Ct. 382, 130 L. Ed. 2d 225 (1994). Like Connecticut law, under federal law, "[a] drug-distribution conspiracy . . . requires proof that the defendant knowingly agreed—either implicitly or explicitly—with someone else to distribute drugs." *United States* v. *Johnson*, 592 F.3d 749, 754 (7th Cir. 2010); see *United States* v. *Parker*, 554 F.3d 230, 234–35 (2d Cir.), cert. denied sub nom. *Baker* v. *United States*, 558 U.S. 965, 130 S. Ct. 394, 175 L. Ed. 2d 301 (2009). As a result of the long running "war on drugs" waged by the federal government, however, a problem has perplexed the lower federal courts that our courts have not encountered: under what circumstances may a conspiratorial agreement to distribute drugs arise in a buyer-seller relationship. This issue has arisen primarily in circumstances in which a defendant has been apprehended while purchasing drugs from an existing criminal enterprise and the question is whether the defendant was a member of the seller's conspiracy.[7] See, e.g., *United States* v. *Brown*, 726 F.3d 993, 995–96 (7th Cir. 2013); *United States* v. *Deitz*, 577 F.3d 672, 678 (6th Cir. 2009), cert. denied, 559 U.S. 984, 130 S. Ct. 1720, 176 L. Ed.

2d 201 (2010); *United States* v. *Hawkins*, 547 F.3d 66, 68 (2d Cir. 2008). The Circuit Courts of Appeals uniformly acknowledge that evidence of a mere buyer-seller relationship, without more, does not constitute a conspiracy to distribute drugs. See *United States* v. *Boidi*, 568 F.3d 24, 30 (1st Cir. 2009); *United States* v. *Parker*, supra, 236; *United States* v. *Gibbs*, 190 F.3d 188, 199 (3d Cir. 1999), cert. denied, 528 U.S. 1131, 120 S. Ct. 969, 145 L. Ed. 2d 840 (2000); *United States* v. *Mills*, 995 F.2d 480, 485 (4th Cir.), cert. denied, 510 U.S. 904, 114 S. Ct. 283, 126 L. Ed. 2d 233 (1993); *United States* v. *Delgado*, 672 F.3d 320, 333 (5th Cir.), cert. denied,     U.S.     , 133 S. Ct. 525, 184 L. Ed. 2d 339 (2012); *United States* v. *Deitz*, supra, 678; *United States* v. *Brown*, supra, 998; *United States* v. *Donnell*, 596 F.3d 913, 924–25 (8th Cir. 2010), cert. denied,     U.S.     , 131 S. Ct. 994, 178 L. Ed. 2d 831 (2011); *United States* v. *Lennick*, 18 F.3d 814, 819 (9th Cir.), cert. denied, 513 U.S. 856, 115 S. Ct. 162, 130 L. Ed. 2d 100 (1994); *United States* v. *Ivy*, 83 F.3d 1266, 1285–86 (10th Cir.), cert. denied sub nom. *Hickman* v. *United States*, 519 U.S. 901, 117 S. Ct. 253, 136 L. Ed. 2d 180 (1996); *United States* v. *Bacon*, 598 F.3d 772, 776–77 (11th Cir. 2010); *United States* v. *Baugham*, 449 F.3d 167, 171 (D.C. Cir.), cert. denied sub nom. *Wells* v. *United States*, 549 U.S. 966, 127 S. Ct. 428, 166 L. Ed. 2d 293 (2006).

Two lines of reasoning have emerged for this conclusion. One group of federal Circuit Courts of Appeals have reasoned that, in a buyer-seller relationship, there is no singularity of purpose and thus no meeting of the minds. "Mere proof of a buyer-seller agreement without any prior or contemporaneous understanding does not support a conspiracy conviction because there is no common illegal purpose: In such circumstances, the buyer's purpose is to buy; the seller's purpose is to sell." (Internal quotation marks omitted.) *United States* v. *Donnell*, supra, 596 F.3d 924–25; see *United States* v. *Brown*, supra, 726 F.3d 1001 ("People in a buyer-seller relationship have not agreed to advance further distribution of drugs; people in conspiracies have. That agreement is the key."). Accordingly, a mere buyer-seller relationship lacks an essential element necessary to form a conspiracy. See *United States* v. *Brown*, supra, 1001 ("[w]e discuss buyer-seller relationships at such length because they do *not* qualify as conspiracies" [emphasis in original]). Another group of federal Circuit Courts of Appeals have reasoned that, under the common-law definition of conspiracy, "when a buyer purchases illegal drugs from a seller, two persons have agreed to a concerted effort to achieve the unlawful transfer of the drugs from the seller to the buyer. . . . [This] *would constitute a conspiracy* with the alleged objective of a transfer of drugs." (Emphasis added.) *United States* v. *Parker*, supra, 554 F.3d 234; see *United States* v. *Delgado*, supra, 672 F.3d 333 (indicating that mere buyers would be guilty of conspiracy to distribute

under general conspiracy principles in absence of exception). Nonetheless, these courts further reason that Congress did not intend to subject buyers, particularly addicts, who purchase drugs for personal use, to the severe liabilities intended for distributors. *United States* v. *Parker*, supra, 235 ("if an addicted purchaser, who acquired drugs for his own use and without intent to distribute it to others, were deemed to have joined in a conspiracy with his seller for the illegal transfer of the drugs from the seller to himself . . . [t]he policy to distinguish between transfer of an illegal drug and the acquisition or possession of the drug would be frustrated"); *United States* v. *Delgado*, supra, 333 ("[t]he rule shields mere acquirers and street-level users, who would otherwise be guilty of conspiracy to distribute, from the more severe penalties reserved for distribut[o]rs"); see also *United States* v. *Ivy*, supra, 83 F.3d 1285–86 ("the purpose of the buyer-seller rule is to separate consumers, who do not plan to redistribute drugs for profit, from street-level, mid-level, and other distributors"). Accordingly, this latter group has deemed a mere buyer-seller relationship to fall within a "narrow *exception* to the general conspiracy rule for such transactions." (Emphasis added.) *United States* v. *Parker*, supra, 234; see also *United States* v. *Delgado*, supra, 333.

As we discuss later in this opinion, we view the first group's characterization to be the correct view of the law. Nonetheless, regardless of whether a court characterizes this issue as a proper application of conspiracy law or an exception to a literal application of that law in furtherance of legislative intent, a survey of federal case law indicates that the principle that conspiracy to sell narcotics cannot be found on the mere basis of a buyer-seller relationship universally stems from two tenets of common-law conspiracy. First, mere association with a member of a conspiracy or acquiescence in the object or purpose of a conspiracy is not sufficient to satisfy the intent elements of conspiracy. *United States* v. *Wardell*, 591 F.3d 1279, 1288 (10th Cir. 2009), cert. denied, U.S. , 132 S. Ct. 430, 181 L. Ed. 2d 280 (2011). Second, conspiracy is a separate and distinct offense from the underlying crime that is the object of the agreement. *United States* v. *Brown*, supra, 726 F.3d 997. Accordingly, in the context of a drug sale between two alleged coconspirators, the federal courts have held that there must be evidence of an agreement to distribute drugs and that such an agreement must be in *addition* to the purchase and sale between the two parties. See id., 998; *United States* v. *Parker*, supra, 554 F.3d 235. Liability will arise as a coconspirator, therefore, when "[the buyer and seller] shared a conspiratorial purpose to advance other transfers, whether by the seller or by the buyer." *United States* v. *Parker*, supra, 235. By contrast, when the government's proof shows *no more* than a simple sales transaction between alleged

coconspirators, its case for conspiracy will fail. Id.; *United States* v. *Moran*, 984 F.2d 1299, 1304 (1st Cir. 1993) ("[a]s for the classic single sale—for personal use, without prearrangement, and with nothing more—the precedent in this circuit as well as others treats it as not involving a conspiracy").

The question then has arisen as to whether the seller's knowledge that the buyer intends to resell the illicit goods is sufficient to establish a conspiracy between the buyer and seller. In resolving this question, many circuits have relied on two decisions that examined under what circumstances a supplier of goods to a known criminal enterprise becomes a party to the existing conspiracy. See *Direct Sales Co.* v. *United States*, 319 U.S. 703, 63 S. Ct. 1265, 87 L. Ed. 1674 (1943); *United States* v. *Falcone*, 109 F.2d 579 (2d Cir.), aff'd, 311 U.S. 205, 61 S. Ct. 204, 85 L. Ed. 128 (1940). In *United States* v. *Falcone*, supra, 580, the defendants were convicted of conspiracy to operate illicit stills because they had supplied distillers with sugar, yeast, and cans. The Second Circuit reversed the convictions, holding that mere knowledge by the defendants that their buyers planned to use the seemingly innocuous supplies in an illegal fashion did not evince their intention to join the conspiracy. Id., 581–82. The court noted: "It is not enough that he does not [forgo] a normally lawful activity, of the fruits of which he knows that others will make unlawful use; he must in some sense promote their venture himself, make it his own, have a stake in its outcome." Id., 581. In affirming the Second Circuit's decision, the Supreme Court held that, if a supplier knows about the unlawful use of his supplies by a buyer, but does not have knowledge of the conspiracy in which the buyer is a member, the supplier cannot be deemed to have joined the conspiracy. *United States* v. *Falcone*, 311 U.S. 205, 207, 61 S. Ct. 204, 85 L. Ed. 128 (1940).

Three years later, in *Direct Sales Co.* v. *United States*, supra, 319 U.S. 715, the Supreme Court affirmed a drug manufacturer/distributor's conviction of conspiracy to violate federal narcotics laws in connection with sales to a physician of morphine—a drug that was highly regulated but one that the distributor lawfully could distribute and the physician lawfully could dispense. The court noted that the evidence established, inter alia, that the distributor repeatedly had sold excessively large quantities of morphine over a long period of time to the coconspirator physician such that the distributor must have known the physician was dispensing the drugs illegally. Id., 713. The court determined that *United States* v. *Falcone*, supra, 311 U.S. 205, was not controlling in this circumstance because morphine is a "restricted commodit[y], incapable of further legal use except by compliance with rigid regulations," whereas the supplies in *Falcone* were "articles of free commerce . . . ." *Direct Sales Co.* v. *United States*,

supra, 710. The court found the distinction between the character of the goods important to the nature and extent of proof necessary to establish the supplier's knowledge of the buyer's unlawful purpose and to show that by making the sale the supplier intends to further, promote, and accomplish that purpose. Id., 711. The court acknowledged that not every instance of the sale of restricted goods in which the seller knows the buyer intends to use them unlawfully will support a charge of conspiracy. Id., 712. This may be true, the court noted, of "single or casual transactions, not amounting to a course of business, regular, sustained and prolonged, and involving nothing more on the seller's part than indifference to the buyer's illegal purpose and passive acquiescence in his desire to purchase, for whatever end. A considerable degree of carelessness coupled with casual transactions is tolerable outside the boundary of conspiracy." Id., 712 n.8. The court then examined the evidence and concluded that it demonstrated there is "informed and interested cooperation, stimulation, instigation. And there is also a 'stake in the venture' which, even if it may not be essential, is not irrelevant to the question of conspiracy." Id., 713; id. (noting that distributor's stake was in making profits, which would only come from encouraging physician's illegal operations).

From these cases, certain principles emerged. Although the Supreme Court indicated that a seller's " 'stake in the venture' " is not essential to sustain a conviction; id.; several Circuit Courts of Appeals have considered this element necessary but subsumed within the foundational principle that, in buyer-seller relationships, the seller must not only have known that the buyer would engage in further distribution, but the seller must have intended and agreed to the shared purpose of further distribution. See *United States* v. *Brown*, supra, 726 F.3d 998; *United States* v. *Boidi*, supra, 568 F.3d 30; *United States* v. *Parker*, supra, 554 F.3d 236; but see *United States* v. *Curley*, 55 F.3d 254, 257 (7th Cir.) ("[t]he law does not require the government to prove that a defendant had a stake in a drug distribution venture to gain a conviction for conspiracy"), cert. denied, 516 U.S. 870, 116 S. Ct. 190, 133 L. Ed. 2d 127 (1995). Nonetheless, because "knowledge is the foundation of intent"; *Direct Sales Co.* v. *United States*, supra, 319 U.S. 711–12; the courts uniformly treat the seller's knowledge of the buyer's further illegal use of the drugs as a significant factor in establishing the seller's intention to agree to the further distribution of the drugs. See, e.g., *United States* v. *Brown*, supra, 998; *United States* v. *Boidi*, supra, 30; *United States* v. *Parker*, supra, 236. With respect to what additional evidence will take the step from knowledge to intent to show that both parties intended and agreed to the shared purpose of the distribution of drugs, the courts have not formulated any particular legal standard, but

have identified certain factors as relevant to this inquiry. These factors include but are not limited to: sales on credit or consignment; *United States* v. *Hawkins*, supra, 547 F.3d 75; large quantities of drugs; *United States* v. *Yearwood*, 518 F.3d 220, 226 (4th Cir.), cert. denied, 555 U.S. 861, 129 S. Ct. 137, 172 L. Ed. 2d 104 (2008); multiple transactions; *United States* v. *Becker*, 534 F.3d 952, 957–58 (8th Cir. 2008); standardized dealings; *United States* v. *Hawkins*, supra, 74; a level of mutual trust; id.; and the continuity of the relationship between the parties.[8] *United States* v. *Deitz*, supra, 577 F.3d 681.

As one court noted, however, "the cases otherwise say little about how the various factors are to be weighed." *United States* v. *Baugham*, supra, 449 F.3d 172. Although the evidence deemed sufficient may include several of these factors; see, e.g., *United States* v. *Johnson*, supra, 592 F.3d 756 n.5 (noting if individual purchases drugs in large quantities on frequent basis on credit, inference of conspiracy properly follows); the existence of a single factor in addition to the buyer-seller relationship may be sufficient. See, e.g., *United States* v. *Yearwood*, supra, 518 F.3d 226 (noting large quantities of drugs alone supports reasonable inference that parties were coconspirators). The recent trend appears to clarify that, while case law had suggested that there is a bright line approach based on enumerated factors to distinguish buyer-seller relationships from conspiracies, a " 'totality of the circumstances' " approach is appropriate. See *United States* v. *Brown*, supra, 726 F.3d 1001; see also *United States* v. *Hawkins*, supra, 547 F.3d 74 ("[n]o single factor is dispositive"). As such, the court must make a "holistic assessment" of the evidence in "deciding whether the jury reasonably discerned an agreement to further trafficking of drugs." *United States* v. *Brown*, supra, 1002.

A close examination of the cases in which the courts have distinguished mere buyer-seller relationships from conspiracies reveals that the former involves isolated sales "to another without prearrangement and with no idea of or interest in its intended use," i.e., simple purchase and sale transactions with no additional evidence of an agreement. *United States* v. *Moran*, supra, 984 F.2d 1303; see *United States* v. *Delgado*, supra, 672 F.3d 333 ("[t]he buyer-seller exception prevents a *single buy-sell agreement*, which is necessarily reached in every commercial drug transaction, from automatically becoming a conspiracy to distribute drugs" [emphasis added]); *United States* v. *Parker*, supra, 554 F.3d 236 (referring to drug transfers that occur without profit motivation and without intention that transferee sell or give drugs to anyone else); see also *State* v. *Gonzalez*, 606 N.W.2d 873, 876 (N.D. 2000) ("The 'something more' required is an understanding between the buyer and seller, often implicit, relating to the subsequent distribution by the buyer. . . . Without more, evidence that

a buyer was reselling the substance is insufficient." [Citation omitted.]).[9] Thus, the few cases in which the federal courts have found the evidence against a defendant in a buyer-seller relationship to be insufficient to show the requisite "informed and interested cooperation, stimulation, [and] instigation"; *Direct Sales Co.* v. *United States*, supra, 319 U.S. 713; are those in which the evidence proved nothing more than a purchase of drugs or mere possession of drugs with intent to distribute. See *United States* v. *Gore*, 154 F.3d 34, 40 (2d Cir. 1998) (holding evidence insufficient when defendant sold drugs to informant, mentioned that drugs were provided by someone else, but gave no specific indication of exact nature of that transaction or quantity of drugs involved); *United States* v. *Evans*, 970 F.2d 663, 673 (10th Cir. 1992) (holding evidence insufficient to find defendant joined existing conspiracy when she made single purchase of crack cocaine from existing conspiracy and there was no evidence that she resold drugs), cert. denied, 507 U.S. 922, 113 S. Ct. 1288, 122 L. Ed. 2d 680 (1993); *United States* v. *McIntyre*, 836 F.2d 467, 471 (10th Cir. 1987) (holding evidence insufficient to find conspiracy from facts that defendant purchased cocaine and shared it with his friends at time of sale); *United States* v. *DeLutis*, 722 F.2d 902, 905 (1st Cir. 1983) (holding evidence insufficient to find conspiracy solely from facts that defendant called special agent to inquire about availability of drugs and arrived at drug distributor's house with nearly $5000 in cash on his person).

In light of the aforementioned case law and considerations articulated therein, we conclude that the federal courts' approach to analyzing the sufficiency of evidence to support a conviction for conspiracy to distribute drugs is consistent with our own conspiracy jurisprudence. Under our conspiracy law, a mere buyer-seller relationship, without more, would not constitute a conspiracy to distribute drugs.[10] Under the specific intent requirements for a conviction of conspiracy under § 53a-48, when a buyer intends only to purchase drugs from a seller, both parties do not unite in the same mental objective because they have different intentions: one has the intention to buy and the other has the intention to sell.[11] See *State* v. *Hernandez*, supra, 28 Conn. App. 134–35 (noting conspirators must specifically intend to agree *and* intend to sell drugs to another person). Further, as the focus of conspiracy is not on the unlawful object of the conspiracy, but on the process of agreeing to pursue that object, to support a conspiracy charge the state must proffer evidence of an agreement in *addition* to the purchase and sale agreement between the two parties.[12] See *State* v. *Beccia*, supra, 199 Conn. 4 ("the prosecution must show not only that the conspirators intended to agree but also that they *intended to commit the elements of the offense*" [emphasis in original; internal quotation marks omitted]). When par-

ties do not unite to form a singularity of purpose, such as agreeing to sell drugs to another person, there is no conspiracy. Indeed, the state did not prosecute the defendant on this theory; rather, it contended that circumstantial evidence supported the inference that the defendant had agreed to participate in a drug distribution plan as a seller, which is an agreement in addition to the agreement made to resupply the defendant with narcotics for resale. Therefore, we fail to see any need to engraft federal conspiracy requirements regarding buyer-seller relationships onto our comprehensive conspiracy jurisprudence.[13]

## II

In light of this conclusion, we now turn to the question of whether there was sufficient evidence in the present case to support the defendant's conviction of conspiracy to sell narcotics. The defendant argues that the evidence, specifically his statements made to the police, was sufficient to sustain only a conviction of attempted possession of narcotics. We disagree.

We begin with the well established principles that guide our review. In reviewing a sufficiency of the evidence claim, we apply a two part test. "First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if there is sufficient evidence to support the jury's verdict. . . .

"While the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . .

"On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Stephen J. R.*, 309 Conn. 586, 593–94, 72 A.3d 379 (2013).

In considering this question, we recognize that, due to the clandestine nature of conspiracies, a conviction is usually based on circumstantial evidence. "The state

of mind of one accused of a crime is often the most significant and, at the same time, the most elusive element of the crime charged. . . . Intention is a mental process which, of necessity, must be proven either by the statements or the actions of the person whose conduct is being examined." (Citations omitted; internal quotation marks omitted.) *State* v. *Williams*, 202 Conn. 349, 356–57, 521 A.2d 150 (1987). In deliberating the conspiracy charge, the jury was allowed to infer the existence of the requisite agreement between the defendant and Thomas not just from the defendant's statements to the police, but also from proof of the separate acts of each of them and from the circumstances surrounding the commission of these acts. *State* v. *Patterson*, supra, 276 Conn. 462. We conclude that the totality of this evidence was sufficient to allow the jury to conclude that the defendant and Thomas conspired to sell narcotics.

There was ample evidence to support the conclusion that the defendant was in the business of selling drugs. Undoubtedly, the most persuasive evidence of this fact comes from the defendant's own statements. At the police station, the defendant admitted to having sold drugs to Zarabozo, who had crack cocaine in his possession after the money exchange with the defendant and who admitted to previous drug transactions with the defendant. The defendant further acknowledged seeking a "resupply" of crack cocaine from Thomas. In addition to his own admissions, the surveillance police officers observed the defendant engaging in a repeated pattern of conduct with occupants of vehicles that all arrived at the same location, an area where citizens had complained about drug dealing occurring, in which the defendant went between that location and a nearby suspected stash house.[14] See *State* v. *Sanchez*, 75 Conn. App. 223, 243, 815 A.2d 242 ("[e]vidence demonstrating that the defendant was present in a known drug trafficking area further suggests an intent to sell" [internal quotation marks omitted]), cert. denied, 263 Conn. 914, 821 A.2d 769 (2003).

The evidence also supports the conclusion that Thomas, known to the Meriden police as a street level dealer operating under the name Fleet, intended to agree with the defendant to assist him in this enterprise. See *Salinas* v. *United States*, 522 U.S. 52, 65, 118 S. Ct. 469, 139 L. Ed. 2d 352 (1997) ("[o]ne can be a conspirator by agreeing to facilitate only some of the acts leading to the substantive offense"). The defendant's characterizations of Thomas as a drug dealer from Waterbury and his statement that Thomas' purpose in meeting with him was to "resupply" him with crack cocaine reasonably connotes not only a past relationship but also the procurement of drugs for a purpose and in a quantity consistent with resale versus personal use. Other evidence reflects an established relationship of mutual trust. See *United States* v. *Hawkins*, supra, 547

F.3d 76 (identifying mutual trust as factor establishing conspiracy). The defendant had Thomas' cell phone number. Thomas either knew to park away from the location of the defendant's exchanges with potential customers or was directed to do so by the defendant. When Thomas arrived, he signaled to the defendant with his car lights in a manner that caused the defendant to approach Thomas' car. If, as the defendant claimed to police, Thomas did not deliver the drugs as planned, the fact that Thomas came to inform the defendant in person that he did not have the drugs that evening also allows for the inference that Thomas had an interest in the defendant's venture and that he expected to resupply him in the future. This evidence in its totality takes the relationship between the defendant and Thomas out of a mere buyer-seller relationship and into a conspiratorial relationship, where both parties agreed and intended to sell narcotics, with Thomas taking the role of the distribution supplier and the defendant acting as the reseller to consumers on the street. Moreover, the defendant's cell phone call to Thomas, followed by Thomas' drive to Maple Branch, the flashing of his vehicle's lights, and the defendant's approach to Thomas' vehicle were all acts that the jury could have construed and reasonably inferred therefrom to be overt acts in furtherance of the conspiracy. See *State* v. *Elijah*, 42 Conn. App. 687, 697, 682 A.2d 506 ("[a]n overt act . . . may be committed by either coconspirator"), cert. denied, 239 Conn. 936, 684 A.2d 709 (1996); id., 695 ("it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct" [internal quotation marks omitted]).

Finally, to the extent that the defendant emphasizes that the jury acquitted him of the charges of sale and possession of narcotics, that fact has no bearing on our examination of the sufficiency of the evidence regarding the conspiracy charge. See *State* v. *Stevens*, 178 Conn. 649, 653, 425 A.2d 104 (1979) ("Consistency in the verdict is not necessary. Each count in an indictment is regarded as if it was a separate indictment." [Internal quotation marks omitted.]). Construing the evidence in the light most favorable to sustaining the verdict, we hold that the evidence was sufficient to support a finding beyond a reasonable doubt that the defendant had conspired with Thomas to sell narcotics in violation of §§ 53a-48 and 21a-278 (b).

The judgment of the Appellate Court is affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

[1] General Statutes § 53a-48 (a) provides: "A person is guilty of conspiracy when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy."

General Statutes § 21a-278 (b) provides in relevant part: "Any person who

manufactures, distributes, sells . . . any narcotic substance . . . who is not, at the time of such action, a drug-dependent person, for a first offense shall be imprisoned not less than five years or more than twenty years; and for each subsequent offense shall be imprisoned not less than ten years or more than twenty-five years. . . .”

[2] Zarabozo gave inconsistent accounts in his statements to the police and in his testimony at trial regarding the location at which he had just purchased the drugs from the defendant. The evening of his arrest, Zarabozo told the police that he had purchased the drugs inside a convenience store at the street corner where the defendant interacted with the various drivers, and at trial he testified that he had purchased the drugs from the defendant while inside his van parked at the street corner. It is unclear whether these inconsistencies, or some other factors, influenced the jury in finding the defendant not guilty of sale of narcotics.

[3] *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[4] Although the defendant is correct that the federal courts analyze this question under a sufficiency of the evidence rubric, we also note that some federal cases suggest that an instruction that a mere buyer-seller relationship does not support a conspiracy conviction properly may be given when requested and supported by the evidence, but that such an instruction may not be required. See *United States* v. *Mata*, 491 F.3d 237, 241–42 (5th Cir. 2007) (holding adequate instruction on law of conspiracy precludes necessity of giving buyer-seller instruction, even where evidence supports such charge), cert. denied, 552 U.S. 1189, 128 S. Ct. 1219, 170 L. Ed. 2d 75 (2008); *United States* v. *Johnson*, 437 F.3d 665, 677 (7th Cir.) (holding defendant's failure to put forth buyer-seller theory at trial and strength of state's evidence of conspiracy leads to conclusion that trial court properly declined to give instruction sua sponte), cert. denied, 547 U.S. 1207, 126 S. Ct. 2902, 165 L. Ed. 2d 919 (2006); *United States* v. *Medina*, 944 F.2d 60, 65 (2d Cir. 1991) (finding trial court properly declined to give buyer-seller instruction upon defendant's request when evidence established that there was “advanced planning among the alleged co-conspirators to deal in wholesale quantities of drugs obviously not intended for personal use”), cert. denied sub nom. *Mata* v. *United States*, 503 U.S. 949, 112 S. Ct. 1508, 117 L. Ed. 2d 646 (1992). In the present case, because the defendant neither requested such an instruction, nor contended on appeal that the instruction given was inadequate to guide the jury, we need not consider under what circumstances it would be proper for the trial court to provide guidance to the jury on what evidence beyond a buyer-seller relationship is required to support a conspiracy charge.

We further note that our research has revealed one case in which the buyer-seller rule or exception has summarily been characterized as an “affirmative [defense] . . . .” *United States* v. *Diaz*, 190 F.3d 1247, 1258 (11th Cir. 1999), cert. denied, 534 U.S. 878, 122 S. Ct. 180, 151 L. Ed. 2d 125 (2001). We view this isolated reference as simply reflective of the generally accepted proposition that this theory is advanced by the defendant as part of his or her defense.

[5] The state also contends that this court should not consider the defendant's claim that we should adopt the buyer-seller “exception” because the defendant failed to bring this theory to the trial court's attention. We note that we are not bound to consider this claim because of the state's failure to raise this preservation argument before the Appellate Court. See, e.g., *Grimm* v. *Grimm*, 276 Conn. 377, 393, 886 A.2d 391 (2005) (defendant's failure to raise issue until oral argument before Appellate Court constituted abandonment of issue before that court and for remainder of proceedings on appeal), cert. denied, 547 U.S. 1148, 126 S. Ct. 2296, 164 L. Ed. 2d 815 (2006). Nonetheless, we note that a motion for a judgment of acquittal will preserve a sufficiency of the evidence claim; see *State* v. *Padua*, 273 Conn. 138, 146 n.12, 869 A.2d 192 (2005); and, although the appellate courts are not bound to consider a claim unless it was distinctly raised at trial; see Practice Book § 60-5; the appellate courts retain discretion to consider legal theories that differ from those raised before the trial court if they relate to an issue preserved for appeal. *Rowe* v. *Superior Court*, 289 Conn. 649, 663, 960 A.2d 256 (2008).

[6] Federal conspiracy law is comprised of dozens of statutes within the United States Code. See, e.g., 18 U.S.C. § 241 (prohibiting conspiracy to violate any person's civil rights); 18 U.S.C. § 371 (prohibiting conspiracy to commit any other federal crime); 21 U.S.C. § 846 (prohibiting conspiracy to violate any statute within Controlled Substances Act). Under federal conspiracy law generally, “the [g]overnment must prove beyond a reasonable doubt that two or more people agreed to commit a crime covered by the

specific conspiracy statute (that a conspiracy existed) and that the defendant knowingly and willfully participated in the agreement (that he was a member of the conspiracy)." *Smith* v. *United States*, U.S. , 133 S. Ct. 714, 719, 184 L. Ed. 2d 570 (2013). The existence of a formal agreement to conspire need not be established; circumstantial evidence, reasonable inferences drawn from the relationship of the parties, and the totality of the circumstances are sufficient proof of a conspiracy. *United States* v. *Johnson*, 592 F.3d 749, 754–55 (7th Cir. 2010); *United States* v. *Redwine*, 715 F.2d 315, 320 (7th Cir. 1983), cert. denied sub nom. *Strong* v. *United States*, 467 U.S. 1216, 104 S. Ct. 2661, 81 L. Ed. 2d 367 (1984).

[7] The existing conspiracies implicated in these cases generally are of two types: (1) a wheel of which the subordinate members of the conspiracy are spokes and the core seller is the hub; or (2) a chain of sale and distribution in which one sells to another who then sells to a third, etc., and the success of the business depends on the ability of each member to resell the drugs to others. *United States* v. *Parker*, supra, 554 F.3d 238.

[8] We note that, in any given case, different circuits may examine all of, some of, or different factors than those we have listed.

[9] See also *United States* v. *Donnell*, supra, 596 F.3d 923–24 ("[w]e have held that '[t]he evidence is sufficient to support a conspiracy where the drugs were purchased for resale' "); *United States* v. *Deitz*, supra, 577 F.3d 678 ("Drug distribution conspiracies are often chain conspiracies such that agreement can be inferred from the interdependence of the enterprise. One can assume that participants understand that they are participating in a joint enterprise because success is dependent on the success of those from whom they buy and to whom they sell." [Internal quotation marks omitted.]).

[10] We note that, while the defendant argues that every drug sale or attempted drug sale in Connecticut could be prosecuted as a conspiracy, he has not provided this court with any case in which a mere purchase and sale, without more, has been charged as, or been the basis of a conviction of, conspiracy to distribute narcotics in our state.

[11] The defendant argues that other state courts have "adopted the buyer-seller exception to drug conspiracies prosecuted under state law." An examination of our sister states' case law indicates, however, that the courts have not adopted a formal buyer-seller rule; rather, they similarly have recognized that a mere purchase and sale agreement between parties, without more, does not constitute a conspiracy to sell or distribute narcotics. See, e.g., *State* v. *Pinkerton*, 628 N.W.2d 159, 164 (Minn. App. 2001) (holding agreement between defendant seller and informant buyer to sell controlled substances to informant does not constitute conspiracy under Minnesota law); *State* v. *Gonzalez*, supra, 606 N.W.2d 876 (holding attempted sale of narcotics between defendant seller and informant buyer is insufficient to prove conspiracy where there was no evidence that informant was going to resell drugs or that defendant believed drugs would be resold); *State* v. *Serr*, 575 N.W.2d 896, 899 (N.D. 1998) (holding evidence that alleged coconspirator was overheard stating that he had procured drugs from another for resale does not give rise to reasonable inference that both individuals had agreed to distribute drugs, only that they were in mere buyer-seller relationship); *State* v. *Gunn*, 313 S.C. 124, 134–35, 437 S.E.2d 75 (1993) (holding single purchase of drugs by defendant from large drug conspiracy without any evidence of agreement to sell drugs is insufficient to prove defendant entered existing drug conspiracy).

[12] It is unclear from the Appellate Court's reasoning whether it held that the mere agreement between the defendant and Thomas for Thomas to sell the defendant crack cocaine was sufficient to constitute a conspiracy to sell narcotics. See *State* v. *Allan*, supra, 131 Conn. App. 440 ("The defendant's statements show that he had intent to buy narcotics from Thomas and that the defendant made arrangements with Thomas to be resupplied with crack cocaine. That agreement, in concert with an overt act . . . is sufficient under Connecticut law to constitute a conspiracy."). To the extent that the Appellate Court suggested as much, that conclusion was improper.

[13] In light of this conclusion, we need not address the defendant's argument that this court's failure to adopt the buyer-seller "exception" would frustrate the intent of our legislature by punishing a mere buyer or addict procuring drugs for personal consumption.

[14] Because the search and seizure warrant was executed for the suspected stash house one or two weeks after the defendant's arrest, the jury reasonably could not conclude that the seized drugs belonged to the defendant, but their presence does support the inference that the defendant could have been using the house for similar purposes.